J-A32045-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS AND DUTIES CONCERNING K.M.T., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.T., FATHER | No. 1915 EDA 2014 |

Appeal from the Decree entered May 22, 2014,
in the Court of Common Pleas of Bucks County, Orphans'
Court, at No(s): 2011-9208

BEFORE:   PANELLA, OLSON, and FITZGERALD*, JJ.

MEMORANDUM BY FITZGERALD, J.:                **FILED MARCH 12, 2015**

T.T. ("Father") appeals from the decree entered in the Bucks County Court of Common Pleas, Orphans' Court Division: (1) granting the petition of private parties J.M. and A.M., husband and wife (collectively, "Petitioners"), to terminate his parental rights to his daughter, K.M.T. ("Child"), under 23 Pa.C.S. § 2511(a)(1) and (b); and (2) denying Father's motion to quash Petitioners' termination petition for lack of standing under 23 Pa.C.S. § 2512(3).[1]  Father challenges both rulings.  We affirm.

The trial court set forth a thorough summary of the testimony adduced at the termination hearing.[2]  Child's mother, M.L. ("Mother") and Father are

---

\* Former Justice specially assigned to Superior Court.

[1] Petitioners, as well as counsel for Child, filed appellee's briefs.

[2] For ease of review, we have substituted the following appellations in the trial court's opinion: "Father" for T.T. and Respondent; "Child" for K.M.T.; and "M.H.," "A.M.," and "J.M." in *lieu* of their full names, and "Petitioners"

both of Vietnamese origin and were married in 2002. They are "the parents of twin developmentally-challenged sons," born in September of 2004 and another son born in January of 2008. Trial Ct. Op., 7/9/14, at 1. As stated above, Child was born in June of 2009. Due to complications from her birth, Mother passed away approximately three and a half weeks later.

> After the loss of his wife, Father decided that it would not be possible for Child to [stay with him.[3]] Father explained [at the termination hearing:] "I could not handle four kids under five years old by myself especially with a newborn who constantly hungry and get diaper changing . . . I cannot help her. I surrender. [I need somebody to help me. I cannot do this on my own by myself."] In light of this capitulation, Father placed Child with [a couple who were Father's own] foster parents after he had immigrated to the United States as a teenager. The [couple] apprised Father that they could only care for Child for a month while he found "more suitable, more long-time care for her."
>
> In August of 2009, after his sister and two nannies declined his request for assistance, Father, through one of his nephews, turned to M.H. for help with Child. M.H. is a licensed foster care person . . . . Father and M.H. first became acquainted with each other through Father's nephews who were M.H.'s third and fourth foster children. The last time Father spoke to M.H. was when his nephew left her care in 1985.

*Id.* at 1-2 (citations to transcripts omitted). "In Father's view, unlike the friend of a neighbor who offered to care for Child . . . for the summer[,] M.H. was 'more like a longer permanent thing.'" *Id.* at 2.

---

for J.M. and A.M. together. Furthermore, we have omitted the trial court's citations to the notes of testimony.

[3] Father testified that after Child was discharged from the hospital, he first took her to his home, but she did not stay overnight. N.T., 1/27/14, at 35.

In early August 2009, Father

brought Child to M.H.'s house in Yardley, Bucks County. Child was approximately six weeks old at the time of the transfer. Father brought the clothing, formula, diapers, and wipes that Child would need during the first few months of her stay with M.H. Father, who had an annual income of approximately $78,000, gave M.H. the gift cards he had received and [$1,000,] which was the only financial contribution he made to M.H. Father also provided M.H. with "a lengthy letter from [his foster mother] detailing everything that she could . . . to advise [M.H."] on how to serve Child's needs and her prior medical history. Father did not inform M.H. about how long he was leaving Child in her care. According to M.H., "I don't think either of us had any idea" as to how long Child would remain in her custody.

Father next saw Child and M.H. in September [2009. Father suggested that he visit M.H.'s house,] but M.H. thought it would be more convenient to make the approximately thirty-minute drive to bring Child to [Father's home in Northeast Philadelphia.] During this hour long visit Child sat with M.H. on one couch while Father sat on the other. According to M.H., "[t]here wasn't a lot of interaction" between Father and Child.

After this visit, M.H. continued to take Child to see Father at his house on a monthly basis for the next six months. The visits . . . generally last[ed] one hour. . . . Through her conversations with Father during these monthly visits, M.H. learned that Father "wanted to get married first because he felt he needed a wife and a mother for the children." M.H. also "got the impression that Father was going to try to have Child come to his home permanently by the end of the year." [Father testified that t]he purpose of these visits was for [him] to apprise M.H. of "what happened with [his] family, [his] situation, and for [his] three kids to get along [and] know Child." Father continued, "mainly I would like [my sons] to get to know my daughter well, because [I already know that was my daughter."]

Aside from these monthly one-hour visits, Father had

no other contact with Child during this period. Despite living a mere half-hour away from M.H., Father did not make a visit to [M.H.'s home] to see Child. Father [testified that he] declined to make an unannounced visit because according to his nephews, M.H. was "very strict about somebody knocking on her door without making appointment." Father did not make separate appointments to see Child aside from those offered because he did not want to disturb M.H. or "to intervene." Apparently, Father assumed that this arrangement "was only temporary until December [2009]" when he would take Child from M.H. to his house. Despite [Father's] initial belief that this placement was only to be temporary, he conceded that this December 2009 target came and passed without Father remarrying or collecting Child from M.H.

Throughout the first seven or eight months Child was in M.H.'s care, M.H. acted as a parent to her, provided Child with everyday care and did everything a parent would normally do for his or her child. M.H. provided Child with food, nurture, and clothing, and was up with Child during her nighttime crying. Furthermore, M.H. selected and brought Child to a pediatrician. . . . M.H. used the medical card Father provided, but Father did not attend any of [Child's] visits to the pediatrician.

During this time, M.H.'s neighbor, J.B., started assisting . . . with Child's care. [J.B. is the mother of Petitioner A.M.] In M.H.'s view, "J.B. was a miracle." M.H. apprised Father that J.B. was aiding her in caring for Child and took J.B. . . . to one of their visits to Father's house in December of 2009. A.M. . . . also started assisting M.H. with Child's care while visiting her mother.

Meanwhile, Father was focused on finding a wife and in November of 2009 he received a picture of the woman who ultimately would become his spouse. In February or March of 2010, Father talked to his future wife on the telephone. Father recounted, "I took a lot of risk on talking to my second wife on the phone and tried to see how she respond to me, see how she answer my question, try to find out what she want, what she like . . . that's when I started to say, okay, this is a done deal." Father thought

- 4 -

of himself as "a breadwinner . . . someone who can provide the necessities" for his children but he could not "give them the mother['s] love because [motherly] love is something that I cannot do." Father planned to travel to Vietnam in May of 2010 to marry his second wife and complete paperwork.

Father saw Child only a few times in the months prior to his trip to meet his future wife in Vietnam. M.H. brought Child to his house for the typical hour-long visit in January [2010], and the scheduled February visit was cancelled due to weather. Father remained in contact with M.H. through e-mail messages and telephone calls, but had no communication or contact with Child that month, nor did he visit Child at M.H.'s house. When M.H. and Child arrived at [Father's] house in March [2010], Father announced to M.H. that "I have prepared to get married in May."

The following month included a visit by Child, M.H., J.B., and A.M. to Father's home. At this April [2010] meeting, Father gave his permission for A.M. to take Child with her overnight to her home in South Philadelphia. Despite Father not visiting A.M.'s home, nor meeting her husband, J.M., Father gave his general assent to overnight visits to [Petitioners A.M. and J.M.], who were undergoing certification to be foster parents. Petitioners cared for Child for twenty one days in May [2010] before a regular schedule of overnight visits developed. A.M. testified that "I believe at that point Child was spending two nights with us, one night with my mother, and the rest of the week with M.H."

In May of 2010, Father visited his prospective wife, [D.B.], in Vietnam. The couple married later during Father's month long visit to the country. Father returned to the United States in June [2010] without [his wife] due to difficulties in obtaining a visa[.] Even though Father was now married, he did not bring Child to his house. Father [testified he] was not ready for Child because "I already took care of three boys. I cannot take another person. . . another kid like five or ten years old, that's better, but not at that age."

After Father returned to the country in June [2010], M.H. brought Child to a [party for Child's birthday] at his house. [M.H. testified that w]hile Father appeared pleased with the celebration, M.H. did not recall much contact between Child and Father at the birthday party. A.M., who was also at the birthday event, observed that the interaction between Father and Child was limited to Father sitting across from Child during a ceremony and taking a photograph together. Father had declined an invitation to a party M.H. held for Child at her house.

[A.M. testified to the following.] In August 2010, Father hired [her] to work as a nanny for his three sons even though she "had met him only twice before, once at his home for the meeting in April [2010] and then once at the birthday party.["] Specifically, Father required somebody to care for [his three sons] and to prepare them for school.[4]

*Id.* at 2-6. On days when A.M.'s husband, J.M., could accompany her, they brought Child to Father's house as well, "so that she would be ready when she was [to move] into that house." *Id.* at 6-7. Such visits by Child occurred approximately four times per month.

A.M. further testified to the following. "On one evening, Father returned home from work and requested that A.M. stay late one day that week so that Father could spend time with Child." *Id.* at 7. On that agreed-upon day, Father arrived home from work, cut the grass, and then let A.M., J.M., and Child leave. "Father did not spend any time with Child that evening." *Id.*

---

[4] A.M. testified, however, the almost-six year old twins and the three-year old son were not enrolled in school. N.T., 12/12/13, at 19. A.M. stated the twins had developmental delays, and Father had told her that one twin had Klinefelter's syndrome, but the other twin was not tested. *Id.* at 20, 21.

- 6 -

By January 2011, [Father's wife] had acquired the required visa to enter the United States. Father asked that Petitioners take care of his three sons while he was away in Vietnam picking up his wife. The three boys stayed with Petitioners in their South Philadelphia home until [Father and his wife] returned to the United States later that month.

[Father's wife] was unable to assist A.M. in teaching Father's sons English as [she] only spoke Vietnamese. Child remained with Petitioners after [Father's wife] arrived although A.M. brought [Child] on a regular basis to Father's residence. A.M. reflected that bringing Child to [Father's residence] was difficult because Child spoke English and [Father's Wife] could not communicate with Child. Father did not have any contact with Child on the days A.M. brought her to his house.

Father brought [his wife] to see M.H. at the end of January 2011. Petitioners were also present at the visit. [Father's wife] had been in the United States about two weeks at the time of this visit. [M.H. testified to the following.] At the time, M.H. believed Father was bringing [his wife] and his sons to her house for an introduction. While Father had spoken to M.H. a few months prior and outlined a "concept" for Child's transition to his house as her permanent residence, at this visit "it seemed to be more that he was making a proclamation that he would be taking her into his house in two weeks."

[M.H. further testified as follows. She] was not prepared to give Child to Father in . . . two weeks. In [M.H.'s] view, Father "would be taking a child who was going on two years old, who didn't know him, who didn't know . . . the new stepmother, who wasn't familiar with their food, who wasn't familiar with their customs and . . . picking her up from here and putting her down there." Although M.H. never had to decide whether to transfer Child to Father, she was "very fearful for the child."

In February of 2011, a series of events transpired which ultimately led to the termination of A.M. as caretaker and tutor for Father's sons. . . . On a Friday . . . A.M. received a telephone call from Father in which he declared that she

did not help his family, specifically his sons, and that "everything [she] had done had hurt them." A.M. was upset at Father's allegations and responded that she thought that "he was a disgusting parent" and that her family had "only done everything to help his family." According to Father, "[t]he reason A.M. was let go, she supposed to stay there and help my kids and my wife, but she did not do a good job . . . ." Additionally, Father testified that he had fired A.M. because she had brought Child back to M.H.'s house whereas Father wanted to see how Child would do in M.H.'s absence and because [A.M.] became argumentative with him.

A.M. appeared for work the following Monday while Father was registering his twin sons at the local elementary school. When Father returned to his home, he terminated A.M. from her duties as nanny to his sons. Father claimed that he contacted M.H. and requested that A.M. not be involved in the care of Child.

Shortly after A.M.'s termination, **M.H.** made a report to the Department of Human Services in Philadelphia (hereinafter "DHS") regarding Father's household. Therein, M.H. reported that "I thought that the situation was not a good one for a child, actually, unsafe and I told the person on the phone things that I had learned or observed myself." Many of M.H.'s allegations were based upon what A.M. had observed during her time at Father's house[, specifically] the prolonged use of baby bottles by Father's sons and Father's practice of putting them in diapers even though A.M. had toilet trained them. The twins were six years old at the time of the report and [the younger son] was nearly three years of age. DHS investigated the report.

Father suspected that **A.M.** had made the telephone call report to DHS. Father claimed that he felt "very . . . very invaded and . . . was completely in shock." Father had learned that a child abuse report was filed "against me because I let my kids live in dirty places and let them go hungry." The report pertained only to Father's sons.

While Father had no contact with Child during this time, M.H. went on vacation to Costa Rica. She had made

arrangements with J.B.[, A.M.'s mother] in 2010 to take care of Child during her trip. M.H. did not discuss her plan with Father because she "was making those decisions." J.B., however, did not take care of Child . . . because of a medical issue, and instead asked Petitioners A.M. and J.M. to take care of Child. Petitioners agreed and brought Child to their new home in Yardley. Once M.H. returned and recovered from an illness during which Petitioners had Child in their care for an extended period of time, Petitioners and M.H. shared caretaking duties. [They] "all shared in the responsibility of [Child's] well-being," and Petitioners made doctor and dentist appointments and took Child to them.

Father [testified that he] had no contact with Child from February through part of June in 2011 "because of the child abuse charge against [him]." Even though Father realized that the report did not concern Child, [he] did not visit Child during this time because he did not want "somebody to call me child abuser when I show up in the neighborhood . . . and look at me and that kind of stuff." Ultimately, DHS found the report unsubstantiated and ended its investigation in early May of 2011.

M.H. did not share any information with Father that would have corrected his impression that A.M. lodged the DHS complaint against him. [M.H.] perceived that Child was better served if Father was not aware of her action. M.H. also believed that furnishing the [$1,000 given to her by Father] to Petitioners to pursue adoption of Child was "the best possible way to extend [her] care for this child." M.H. also acknowledged that she "put him off" and attempted to secure delays in the transfer of Child to Father's house.

Father waited until the end of June of 2011 to see Child because he "did not feel like it was any emergency where I have to see her or something." Father did not believe there was "a rush or anything like that." Father described himself as "really laid back" and he wanted to "take some time and try not to rush and stuff." Father next saw Child at a lunch in celebration of [Child's] second birthday that M.H. arranged at a restaurant. There was no interaction between Father and Child as he was occupied with helping

his twin sons eat.

Contemporaneously, Father informed M.H. that January 2012 was his deadline for claiming Child in response to her suggestion that he give his wife time to acclimate to this country.  Father also testified that he failed to take custody of Child because his wife was "homesick" and he did "not want to push her into caring for another kid."  Father's "priority" was to get his wife accustomed to American culture prior to bringing Child to his house.  M.H. suggested to Father that [his wife], who wanted to learn English and how to drive, and his youngest son . . . visit her house "a couple of times" in July [2012].  Father replied that [his wife] was unable to travel to [M.H.'s house] because she was employed; however, this job did not last and a few of the proposed July dates became available.

Moreover, Father created this new deadline despite seeing Child on only two occasions—once in January, and once in June [2011]—prior to the declaration.  Father did not place a telephone call to M.H. until August [2011] because he forgot to call her to inquire about Child in July due to a medical issue with his wife's uncle.  Father arranged for a visit to see Child in September [2011], but this visit was cancelled because his kids were ill.

Father made his third and final visit to [M.H.'s home] in December of 2011.  [At this time, Child was two years and six months old.]  Father recalled that he had bought some gifts for his daughter and . . . a Christmas present for M.H..  This Christmas present was the only contribution Father provided to Child's caregivers that year.  Father maintained that, during the course of 2011, he inquired with M.H. as to whether Child needed diapers or milk.  Father even offered to "baby-sit" Child and told M.H. that "my wife and I can come up there and watch the kid for you while you do Christmas decorations." M.H. declined.

Trial Ct. Op. at 7-12 (emphases added).  Finally, we note that Father and his current wife have a daughter who was born in August of 2012.  N.T., 1/27/14, at 5.

- 10 -

On December 23, 2011, when Child was approximately two and a half years old, Petitioners J.M. and A.M. filed a: (1) petition to terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), and (2); (2) a "Joinder of Adults Intending to Adopt Child;" (3) and a petition to adopt Child. On the same day, M.H. filed a "Report of Intermediary," claiming herself to be the intermediary. On March 5, 2012, the court appointed counsel to represent Child.

On August 13, 2012, Father filed a response, denying that Petitioners had *in loco parentis* status, and arguing that he and M.H. merely had a child care agreement, he had specifically directed M.H. not to permit A.M. to have contact with Child, and M.H. had agreed to his request but continued to allow A.M. to have contact with Child. Father's Resp., 8/13/12, at ¶ 1. On October 15, 2013, Father filed a motion to quash the termination petition and a motion for summary judgment.

> On May 22, 2012, the [trial court] granted Petitioners' Petition for Discovery which permitted any party . . . to motion for hearing upon the completion of discovery. Meanwhile, Father commenced a custody action in the Family Court Division of the Bucks County Court of Common Pleas. On November 2, 2012, Petitioners and Father appeared before [another judge] and entered into an agreement on the record.

Trial Ct. Op. at 12. The agreement provided: (1) the parties will participate in an evaluation by John Shanken-Kaye, Ph.D., to determine whether it was in Child's best interests to have contact with Father or "contact should continue exclusively with" Petitioners; and (2) Petitioners "will not move

- 11 -

forward with the termination of parental rights hearing until this evaluation

is concluded." *Id.*

> Dr. Shanken-Kaye's evaluation and written report were completed on or about September 10, 2013. . . . Petitioners moved for a hearing on their . . . Petition [to terminate Father's parental rights.] On October 15, 2013, Father filed a Motion for Summary Judgment and Motion to Quash . . . . On December 2, 2013, after a conference with counsel and the submission of briefs, [the court] denied Father's Motion for Summary Judgment.

*Id.* at 12-13.

The trial court held evidentiary hearings on December 4, 5, and 12, 2013, and January 27, 28, 2014. On May 22, 2014, the court entered the underlying decree, denying Father's motion to quash the termination petition and granting the petition to terminate his parental rights under Subsection 2511(a)(1).[5] Father took this timely appeal,[6] raising three questions for our review, whether: (1) Petitioners had standing under 23 Pa.C.S. § 2512(3) to seek termination of his parental rights; (2) Petitioners met their burden of proof to terminate his parental rights under Subsection 2511(a)(1) by clear

---

[5] The court's decree did not identify the section under which it was terminating Father's parental rights. However, the court's opinion stated "the present thrust of Petitioners' case is that grounds exist under Section 2511(a)(1)," and the court granted termination on that ground. Trial Ct. Op. at 17.

[6] Father failed to file a statement of errors complained of on appeal along with his notice of appeal, in contravention of Pa.R.A.P. 1925(a)(2)(i). On June 19, 2014, the trial court directed Father to file immediately a concise statement, and Father filed one on June 30th. We decline to dismiss or quash this appeal due to the untimely 1925 filing. *See In re K.T.E.L*, 983 A.2d 745, 747 (Pa.Super. 2009).

and convincing evidence; and (3) the termination of his rights is in Child's best interests.

Father's first claim is that Petitioners did not stand *in loco parentis* to Child and therefore lacked standing under Section 2512(3) to seek termination of his parental rights. Father avers that M.H. never stood *in loco parentis* to Child, and that she admitted "she was a 'temporary foster mother.'" Father's Brief at 14. Accordingly, Father reasons, M.H. "could not confer *in loco parentis* status to" Petitioners, as they claimed. Father concludes the trial court was required to dismiss their petition "without further inquiry." *Id.* at 15. We disagree.

On this issue, our standard of review is as follows:

> "[T]he question of standing is whether a litigant is entitled to have the court decide the merits of the dispute or of particular issues." "When a statute creates a cause of action and designates who may sue, the issue of standing becomes interwoven with that of subject matter jurisdiction. Standing then becomes a jurisdictional prerequisite to an action." "Issues pertaining to jurisdiction are pure questions of law, and an appellate court's scope of review is plenary." "Questions of law are subject to a *de novo* standard of review."

*In re B.L.J., Jr.*, 938 A.2d 1068, 1071 (Pa. Super. 2007) (citations omitted).

Section 2512(a)(3) of the Adoption Act provides:

> **(a) Who may file.—**A petition to terminate parental rights with respect to a child under the age of 18 years may be filed by any of the following:
>
> \* \* \*

- 13 -

> > (3) The individual having custody or standing in loco parentis to the child and who has filed a report of intention to adopt required by section 2531[.]

23 Pa.C.S. § 2512(a)(3).

This Court has stated: "Third parties who are not designated foster parents may seek adoption when they can establish that they stand *in loco parentis* to the child." **B.L.J.**, 938 A.2d at 1072 (citation omitted).

> > Further, the legal status of *in loco parentis* refers to a person who puts himself or herself "in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption."

> > There are two aspects to the concept of *in loco parentis*: assumption of parental status and discharge of parental duties. In order for assumption of parental duties to be legitimate, it must have been accomplished through some legally cognizable means. Furthermore, the assumption of parental status must be predicated on the natural parent's agreement to a permanent placement of the child.

> "The rights and liabilities arising out of an in loco parentis relationship are, as the words imply, exactly the same as between parent and child."

*Id.* at 1073 (citations omitted).

> > The in loco parent is basis for standing recognizes that the need to guard the family from intrusions by third parties and to protect the rights of the natural parent must be tempered by the paramount need to protect the child's best interest. Thus, while it is presumed that a child's best interest is served by maintaining the family's privacy and autonomy, that presumption must give way where the child has established strong psychological bonds with a person who, although not a biological parent, has lived

with the child and provided care, nurture, and affection, assuming in the child's eye a stature like that of a parent. Where such a relationship is shown, our courts recognize that the child's best interest requires that the third party be granted standing so as to have the opportunity to litigate fully the issue of whether that relationship should be maintained even over a natural parent's objections.

Although the requirement of in loco parentis status for third parties seeking child custody rights is often stated as though it were a rigid rule, it is important to view the standard in light of the purpose of standing principles generally: to ensure that actions are brought only by those with a genuine, substantial interest. When so viewed, it is apparent that the showing necessary to establish in loco parentis status must in fact be flexible and dependent upon the particular facts of the case. . . .

*J.A.L. v. E.P.H.*, 682 A.2d 1314, 1319-20 (Pa. Super. 1996).

The phrase "in loco parentis" refers to a person who puts himself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption. The status of 'in loco parentis' embodies two ideas; first, the assumption of a parental status, and, second, the discharge of parental duties.

*McDonel v. Sohn*, 762 A.2d 1101, 1105 (Pa. Super. 2000) (citation omitted).

In the instant case, the trial court found M.H., and then Petitioners, stood *in loco parentis* to Child as follows:

Father brought Child to M.H.'s home in August of 2009 after he declined an offer of temporary care from a friend of his neighbor. Instead, he chose to place Child [with M.H.] because [her] offer appeared to him as "more like a longer permanent thing." Father viewed his role as that of a provider but abrogated his responsibilities as a parent to provide care, nurture, and affection, and to develop an emotional bond. Instead, M.H. assumed these obligations,

- 15 -

which included selecting a pediatrician and taking Child for visits. In our opinion, M.H. attained *in loco parentis* status as she was Child's parental figure until Petitioners entered Child's life.

In April of 2010, Father gave his assent to Child making overnight visits to Petitioners' house, then in South Philadelphia. The record is devoid of any evidence establishing that Father set any restrictions as to how often Child would stay at [Petitioners' home] relative to her stay at M.H.'s home. Petitioners were an essential and valuable resource for M.H. in providing care for Child in a critical stage of her life and they offered nurture, care, and affection to Child, including housing, food, and other necessities.

Trial Ct. Op. at 14-15.

After the placement, Father had two and a half years to bring into fruition one of his multiple plans to make Child a part of his household.

While Father repeatedly spoke of bringing Child to his home after this temporary separation, his conduct belied these expressed intentions. Specifically, Father rejected an offer from his first wife's sister, in September 2011, to take Child until she was an adult because she had two other sons, and he did not want Child to impact the situation whereby his former sister-in-law would then "throw Child back onto me." We perceive that even if Father viewed that the placement was temporary, the indefinite placement in the present case, lasting for more than two years prior to the filing of the Petition, is for all practical purposes a permanent placement with respect to Child.

\* \* \*

Accordingly, because M.H. obtained *in loco parentis status*, she was in a position to act as parent and could place Child with Petitioners for the purpose of adoption and file for the termination of parental rights. Furthermore, as Father initially agreed to Child's placement with Petitioners, we find that, under the circumstances of this

case, Petitioners have standing to file for termination of parental rights.

*Id.* at 16.

We agree with the trial court that Petitioners assumed *in loco parentis* status through their roles as Child's primary caretakers. **See** 23 Pa.C.S. § 2512(a)(3); **B.L.J.**, 938 A.2d at 1072. First, the record supports a finding that Father, despite his claims that he planned to resume custody or charge of Child, made no progress ever towards doing so. From the time Father brought Child, at six weeks old, to M.H.'s home, M.H. made all medical decisions for Child. She, and later Petitioners, housed, fed, clothed, nurtured, and cared for Child. After considering the extensive testimony cited by the trial court, as well as our own review of the record, we agree with the trial court that M.H. had established *in loco parentis* status and was then "in a position to act as parent and . . . place Child with" Petitioners. **See** Trial Ct. Op. at 16.

Thus, in light of all the evidence set forth above, we agree that Father discharged his parental duties. **See B.L.J.**, 938 A.2d at 1073. Accordingly, Petitioners assumed parental duties through legitimate means, and we do not disturb the trial court's finding that they had standing to seek termination of Father's parental rights. **See id.**

Next, we address Father's challenge to the termination of his parental rights under Subsection 2511(a)(1). First, his appellate brief argues "one needs to understand [F]ather" and "imagine what it was like to be in [his]

shoes." Father's Brief at 16. The brief summarizes that he was born in Vietnam in 1966 "during the height of the war," was orphaned at age three and raised by his sister who is twenty-five years older, "escaped Vietnam on a boat," entered a refugee camp in Malaysia at age fifteen, immigrated to the United States at age sixteen and lived with four foster families. *Id.* The brief also states that "[i]n the Vietnamese culture, . . . the mother is the primary care giver, and the father the primary financial provider." *Id.* The brief then appears to cite this belief in justifying the observations of Dr. Shanken-Kaye—that Father believes "all child rearing are invested in the woman[, which] explains [his] failure to have any meaningful relationship with his daughter over the years as well as his failure to make any meaningful plans for reunification of his family until he was able to locate and marry a woman." *Id.* at 16-17.

Additionally, Father avers the following. He "was overwhelmed with the responsibility of 4 children under the age of 5 years old, when his wife . . . died," "made appropriate arrangements for his children," and "was upfront with his plan for reunification." *Id.* at 17. "Father blindly trusted [M.H.] in all matters and did not question her judgment." *Id.* Furthermore, psychological testing reported that he "does not see himself as vexed by any of the circumstances in his life" and "[t]his apparent insouciance does help explain how [he] could allow so much time to pass without making any serious attempt to reunite with his daughter, or indeed get to know her at

all." *Id.* By January 2011, "Father's situation had dramatically improved with the addition of his new wife." *Id.* He owns a five-bedroom home, makes a substantial salary, had Child on his medical insurance plan since birth, paid her unreimbursed medical expenses, was apprised of her doctor appointments, milestones, and accomplishments. Additionally, in June 2011, six months before Petitioners filed the petition, Father communicated with M.H. several times via email. He requested visits with Child in August, September, and November, but could not see her until December 3rd. Father concludes that "[b]ased upon the above, there is no clear and convincing evidence that [his] conduct for a period of at least 6 months . . . evidenced a settled purpose of relinquishing parental claim to [Child] or a refusal or failure to perform parental duties." *Id.* at 20. We find no relief is due.

We note the relevant standard of review:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that [we] would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In the Interest of J.T.*, 983 A.2d 771, 775 (Pa. Super. 2009) (citation omitted).

In the case *sub judice*, the trial court terminated Father's parental rights pursuant to section 2511(a)(1) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \*

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A § 2511(a)(1), (b). "The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so." *J.T.*, 983 A.2d at 775 (citation omitted).

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation

is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life'.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs. . . . .

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted).

Under subsection (a)(1),

[o]nce the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*J.T.*, 983 A.2d at 777 (citation omitted).

In the instant case, the trial court first found Father's conduct established a failure to perform his parental duties in the six-month period

preceding the filing of the termination petition:

> While Father may have provided M.H. with some initial supplies when he dropped off Child in August 2009 and occasionally paid a few medical bills, the record is silent as to any instance where he fed Child a meal, changed her diaper, supervised her on his own, or even spoke to her. . . . Father recognized his own inability to provide Child with what he described as "mother love."
>
> Even with respect to his view of his duties as a father, Father failed to provide a roof over Child's head and provided minimal financial support for her despite earning $78,000 per year. Instead, Father surrendered those duties to others, namely Petitioners, as he pursued his main objective, finding a wife to raise his children.
>
> Even after [Father's Wife] had been in the United States for about a year, Father had made no meaningful progress towards collecting Child from M.H. and bringing her to his house. Other priorities emerged for Father that precluded him from parenting Child. For instance, Father wished for his wife to get accustomed with Child prior to Child entering his household because he envisioned that his . . . wife would be Child's primary caregiver. M.H. offered to host [Father's wife] once or twice a week in order for her to become familiar with Child, but this gesture was declined.

Trial Ct. Op. at 18-19.

The court then considered Father's reasons for his actions. *See J.T.*, 983 A.2d at 777. It stated:

> Initially, we accept Father's representation that he experienced a difficult childhood in Vietnam and overcame serious challenges in relocating to the United States and becoming a productive citizen. Furthermore, we recognize that Father faced significant adversity from the passing of his wife following Child's birth and we do not take issue with Father's decision to seek help with the care of Child while he cared for his three sons in the aftermath of his wife's passing.

Trial Ct. Op. at 20. However, the court further found that as time passed, he "lost focus" on his plan to bring Child back into his home. *Id.* The court rejected Father's explanations that he wished his wife first to be comfortable living in the United States, that his son and his wife's uncle were ill, and that he "feared the supposed judgment of M.H.'s neighbors" when DHS conducted its investigation. *Id.* at 21.

The court also considered M.H.'s "admission that in 2011 she intentionally put [off Father] and tried to delay his plan to take custody of Child." *Id.* The court found that nevertheless, Father knew that Child was under M.H.'s care "a mere thirty minutes away and made no effort to assert himself as a parent or to claim Child." *Id.* at 21-22.

Next, the court considered "the post-abandonment contact between" Father and Child. *See J.T.*, 983 A.2d at 777. "Father's last visit with Child occurred in December of 2011 and he has not seen Child since the Petition was filed that same month." Trial Ct. Op. at 22. Although Father "appear[ed] to assert that a Court Order stayed his petition to gain custody of Child and prevented him from contacting her," there was no such order, and only an agreement placed on the record in Family Court that Petitioners would not proceed with their termination petition until the completion of Dr. Shanken-Kaye's evaluation. *Id.*

After careful review of the record, we conclude the trial court properly considered the factors for termination under subsection 2511(a)(1), and its

findings are supported by clear and convincing evidence. Father's claim on appeal that in January 2011 his "situation had dramatically improved" does not include any mention of how his conduct concerning Child changed or improve. *See* Father's Brief at 17. Father's payment of medical expenses for Child and giving $1,000 to M.H. were considered by the trial court along with all other evidence adduced. Finally, while we share the trial court's observation that Father overcame serious challenges in childhood and adolescence, we reject Father's inference on appeal that any alleged cultural or gender creeds justify a "belief that all child rearing responsibilities are invested in the women." *See* Father's Brief at 16. Instead, the court properly considered the factors under Subsection 2511(a)(1)—whether Father's conduct refused or failed to perform parental duties, by evidencing more than a passive interest in Child's development and fulfilling a financial obligation, and instead acting affirmatively to provide love, protection, guidance and support to Child. *See* 23 Pa.C.S. § 2511(a)(1); *B., N.M.*, 856 A.2d at 855.

Father's third issue on appeal pertains to subsection 2511(b). He avers that "[i]n August, 2009, [he] made sure all of [Child's] needs would be met" by, as conceded by M.H., placing Child in M.H.'s care "to assure [Child] had . . . physical and emotional care." Father's Brief at 21. He concedes "[w]hile it is true that [F]ather has no meaningful relationship with" Child, he contends, without further explanation, "[t]he lack of meaningful relationship

is not only due to [his] personality, . . . inaction and beliefs, but also to" M.H. and Petitioners. *Id.* at 21-22. Father further asserts "his inaction never demonstrated a settled purpose to relinquish his parental rights," and despite "the fact that [Child] does not know her biological family, according to Dr. Shanken-Kaye, it is possible, over time and with great professional help, to reunite [Child] with her biological family." *Id.* We find no relief is due.

This Court has stated:

> [U]nder Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. . . . Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Here, the trial court considered Dr. Shanken-Kaye's evaluation of the relationship between Father and Child:

> Based upon his interviews, his home visits, his testing and his discussions with collateral individuals, Dr. Shanken-Kaye reached an opinion based upon a reasonable degree of certainty in the field of psychology. Dr. Shanken-Kaye stated that his "concern for Child is that there is no relationship between Child and Father." Dr. Shanken-Kaye testified that there has been "ample time and opportunity for Father to have established even a rudimentary relationship with Child." By contrast, Dr. Shanken-Kaye recognized that Child has "an extremely

close and . . . emotionally satisfying and appropriate relationship with Petitioners, with their extended family and with M.H." Dr. Shanken-Kaye further stated:

". . . I have a significant concern that a child almost five years old be taken from a situation, where on all measures she is thriving and placed into a situation that . . . is not only alien, but has within its own structure significant challenges that have not yet been successfully met, and I just believe that this would prove to be highly traumatic and not something that could be overcome in any reasonable fashion or any reasonable length of time."

Trial Ct. Op. at 24. The court also found:

This lack of a parent-child relationship manifested itself during a meeting at Dr. Shanken-Kaye's office[.] Prior to this meeting[,] Child was playing in Dr. Shanken-Kaye's playroom by herself. Thereafter, Father entered the room. Dr. Shanken-Kaye observed that Child accepted Father as another person in the room, but "there was also no recognition at all. Child did not stop what she was doing or turn around and say hello or smile or whatever." Child terminated the play session with Father by saying "[c]an I play with mommy and daddy" whereupon Father went into Dr. Shanken-Kaye's office and Child rejoined Petitioners. Dr. Shanken-Kaye also noted that Child had made a drawing of her family and "the family consisted of herself[ and] Petitioners."

*Id.*

On appeal, Father concedes he "has no meaningful relationship with Child" and that Child "does not know her biological family." Father's Brief at 21, 22. Father instead postulates that "it is possible, over time and with great professional help, to reunite [Child] with her biological family." *Id.* at 22. Subsection 2511(b) does not provide for the possibility of a future relationship, but instead requires the court to focus on the present "nature

and status of the emotional bond between parent and child." **See** 23 Pa.C.S. § 2511(b); **L.M.**, 923 A.2d at 511. Our review of the record indicates there was competent evidence to support the trial court's decision that termination of Father's parental rights best serves Child's developmental, physical, and emotional needs and welfare. Although Father expresses on appeal a willingness to fulfill his parental duties for Child, the record indicates his lack of effort towards cultivating a parental bond with Child, while others provided the nurture, care, and affection that Child needs. Moreover, the trial court found Child has bonded with Petitioners.

In consideration of these circumstances and our careful review of the record, we conclude that the trial court did not abuse its discretion or commit an error of law in finding competent evidence to support the termination of Father's parental rights to Child under section 2511(b).

For the reasons stated above, we affirm the trial court's decree finding that Petitioners had standing to petition for the involuntary termination of Father's parental rights and that grounds were established for involuntarily terminating his parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(1) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/12/2015