Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/07/2023 09:05 AM CST

Emmett Hughes, appellant, v. Lexus
Christensen and Dashaun
Falcon, appellees.

___ N.W.2d ___

Filed February 7, 2023.    No. A-22-080.

1. **Child Custody: Visitation: Appeal and Error.** Child custody determinations, and visitation determinations, are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion.
2. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.
3. **Parent and Child: Child Custody: Visitation: Standing.** A claim for custody or parenting time by a nonparent may be brought by a common-law right to standing based on the doctrine of in loco parentis where the exercise of those rights is in the best interests of the child.
4. **Parent and Child: Words and Phrases.** A person standing in loco parentis to a child is one who has put himself or herself in the situation of a lawful parent by assuming the obligations incident to the parental relationship, without going through the formalities necessary to a legal adoption, and the rights, duties, and liabilities of such person are the same as those of the lawful parent.
5. **Parent and Child.** The focus of an in loco parentis analysis must be on the relationship between the child and the party seeking in loco parentis status, examining what, if any, bond has formed between the child and the nonparent.
6. **Parent and Child: Child Custody: Standing.** Once the doctrine of in loco parentis confers standing on the nonbiological parent, a full hearing is required on whether custody in favor of the individual with in loco parentis status is in the best interests of the minor child.

7. **Parent and Child: Standing: Proof.** Once a party has demonstrated an intimate parent-like relationship with a child, courts recognize that the child's best interests require that the third party be granted standing so as to have the opportunity to litigate fully the issue of whether that relationship should be maintained even over the natural parent's objection.

8. **Parent and Child.** Unlike biological and adoptive parenthood, the status of in loco parentis is temporary, flexible, and capable of being both suspended and reinstated.

9. ____. Application of the in loco parentis doctrine depends upon the circumstances in existence when the nonparent claims a child's best interests lie in allowing him or her to exercise parental rights.

10. ____. Once the person alleged to be in loco parentis no longer discharges all duties incident to the parental relationship, the person is no longer in loco parentis.

11. **Trial: Evidence: Appeal and Error.** A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.

12. **Trial: Courts.** A trial court has broad discretion to make evidentiary rulings conducive to the conduct of a fair and orderly trial.

Appeal from the District Court for Hall County: JOHN H. MARSH, Judge. Affirmed.

Mitchell C. Stehlik, of Stehlik Law Firm, P.C., L.L.O., for appellant, and Emmett Hughes, pro se.

David V. Chipman, of Monzón, Guerra & Chipman, for appellee Lexus Christensen.

PIRTLE, Chief Judge, and BISHOP and ARTERBURN, Judges.

BISHOP, Judge.

## INTRODUCTION

Emmett Hughes appeals from the Hall County District Court's dismissal of his complaint seeking physical custody and parenting time with Mylez C. Although Hughes is not Mylez' biological father, he claimed he stood in loco parentis to the child. Mylez' biological mother, Lexus Christensen, disagreed. Following a 2-day trial, the district court acknowledged

that Hughes had "acted in a parental role to Mylez at one time," but failed to prove he had "assumed all obligations incident to the parental relationship," and further, that Hughes had "fallen woefully short in minimizing the child's exposure to harmful parental conflict." In dismissing Hughes' complaint, the court concluded that Hughes "failed to prove that continuing any in loco parentis status [was] in Mylez' best interest." We affirm.

## BACKGROUND

### 2016 Case Involving Parties' Biological Daughter

Mylez was born in December 2011. A year later, Christensen and Hughes began a relationship and, shortly after, began living together. In February 2015, Christensen and Hughes had a daughter, Rielle L. While the parties were together, Hughes fostered a relationship with Mylez resembling that of a parent and child. According to Hughes, while cohabitating with Christensen, he changed Mylez' diapers, took him to doctors' appointments, was involved in his schooling, enrolled him in extracurricular activities, took him to church, and provided him with necessities such as housing, clothing, and food. For a period of time, Mylez even called Hughes his father.

In May 2016, when Christensen and Hughes' relationship ended, Christensen moved out without notifying Hughes and she took Mylez and Rielle with her. Hughes filed a "Complaint to Establish Paternity" in relation to Rielle in the Hall County District Court. On August 3, 2016, the court issued a temporary order finding Hughes to be the biological father of Rielle. The court also addressed Mylez, finding that Hughes was not Mylez' biological father, but the parties had recognized Hughes had "stood in loco parentis" to Mylez, and that it was in Mylez' best interests to be "included only in the parenting plan." The court went on to state that it did not have jurisdiction to require Christensen to have Mylez "participate in visitation," and that "allowing Mylez to participate in

visitation is entirely voluntary." The court made it clear that nothing in the order provided or created "a right of visitation or custody" in Hughes, nor did it prevent Christensen from "denying visitation" between Hughes and Mylez. However, the order granted joint legal custody of the "children" to the parties and physical custody to Christensen, subject to Hughes' visitation rights.

The 2016 order was effective until the final order was entered on March 20, 2019. In that order, the district court retained legal custody of Rielle and placed her physical custody with Hughes, subject to Christensen's parenting time. Although the court pointed out that Hughes had assumed a parental role for Mylez and that the "evidence is undisputed that Hughes and [Mylez] have a good relationship," the remainder of the order was silent as to Mylez.

In October 2019, Hughes filed an "Application to Add Minor Child and Application to Modify Parenting Time," wherein he asked the court to add Mylez to the action and grant him custody of Mylez. Following a hearing, the court entered an order on December 30, 2019, finding that "[w]hile the evidence is clear that . . . Hughes has a close relationship with Mylez[,] he is not Mylez['] biological father," and "has no legal right to receive custody or visitation." The court dismissed Hughes' application to add Mylez, but "emphasize[d] that nothing" in the order "should be construed as the Court attempting to forbid contact between . . . Hughes and Mylez[,] [b]ut that contact must be [by] agreement of the parties rather than through court order."

## Current Proceedings

Approximately a year later, on December 16, 2020, Hughes filed a "Complaint to Establish Custody and Visitation *In Loco Parentis*" in the Hall County District Court. Hughes claimed that he had established a parent-child relationship with Mylez such that he stood in loco parentis and asked the district court to award him parenting time and primary

physical custody of Mylez. Trial took place on September 9 and December 8, 2021. Christensen was represented by counsel. Hughes appeared pro se, but he had counsel available on a limited scope basis during the first day of trial to provide guidance regarding trial procedure; counsel withdrew for the second day of trial. The parties offered exhibits and witness testimony. We summarize some of the evidence here and set forth further evidence as necessary in our analysis below.

Hughes testified that although he and Christensen "love[d] each other," their relationship was "toxic" during "the entire five years that [they] were together." According to Christensen, Hughes assaulted her numerous times throughout their relationship. Although called to testify by Hughes, one of Christensen's friends stated that Hughes frequently became aggressive toward Christensen and called her a "stupid bitch" in the presence of Mylez and Rielle. Christensen stated that she had assaulted Hughes, but only in self-defense.

Following the parties' breakup, their relationship only further deteriorated—so much so, that in August 2016, Christensen obtained a domestic abuse protection order against Hughes. Hughes also exhibited concerning behaviors toward Christensen which led to various criminal convictions. In July 2017, Hughes was convicted of "Attempt of a [C]lass 2A Felony" because he attempted to strike Christensen and her then-boyfriend with his vehicle. In May 2018, Christensen obtained a harassment protection order against Hughes; 4 months later, Hughes was charged with violating the protection order, and in March 2019, he was convicted of the charge. In February, Hughes was found guilty of reckless driving and negligent child abuse; the convictions involved an incident where Hughes withheld Mylez and Rielle from Christensen and drove recklessly with the children in the vehicle in an attempt to "lose" Christensen as she followed him.

After the March 2019 order pertaining to Rielle was entered, Christensen cut off Hughes' contact with Mylez and Hughes continued to exhibit concerning behaviors toward

Christensen. According to Christensen, Hughes stalked her, ambushed her at her home, video recorded their every interaction, threatened her, insulted her in the presence of Mylez, and informed her that "he had people watching [her]." Another one of Christensen's friends called by Hughes to testify stated that in late 2020, Hughes arrived at Christensen's trailer home unannounced while Christensen, Mylez, and Christensen's friends and their children were in the trailer. When Hughes attempted to enter the trailer, Christensen's friend told him to leave. Hughes then began peering through the windows of the trailer. Shortly after, law enforcement arrived after receiving a report from Hughes that Christensen and her friends were "hiding somebody in the house." Law enforcement searched the property but did not find anything and ultimately did not charge Christensen or her friends with any crime. This incident was consistent with a pattern Hughes exhibited of weaponizing law enforcement to harass Christensen.

According to Hughes, he contacted law enforcement "[p]robably more than 70 times" about Christensen from 2016 to the date of the trial. No criminal charges against Christensen ever resulted from these calls to law enforcement, but at least two of the calls resulted in criminal charges against Hughes. In November 2018, law enforcement forwarded a report detailing Hughes' repeated contacts to law enforcement which resulted in "unfounded or unenforceable incident[s]" to the Hall County Attorney's office for a potential harassment protection order violation. No charges resulted from this report.

In its December 15, 2021, order, the district court found that Christensen had allowed Hughes "to have extensive contact" with Mylez for several years and that the "acts and declaration of the parties, including [Christensen] referring to [Hughes] as Mylez' father support an inference that [Hughes] was assuming at least some obligations of the parental relationship." The court further stated:

Parental rights are an important constitutional right. [Hughes] did not plead parental unfitness and the Court

did not allow evidence on that issue. The parental preference doctrine does not determine the outcome of this action. This action directly implicates a parent's right to determine who should have contact with her child. A natural parent's right to determine the identity of people who will be involved in a child's life seems an important aspect of the parent-child relationship. The mother's opinion that continued contact is not in Mylez' best interest is entitled to some deference by the Court.

The Court finds that there are objective reasons supporting the mother's concern for a continuing relationship between Mylez and [Hughes]. [Hughes] was convicted of a felony assault of [Christensen]. [Hughes] was convicted of [c]hild neglect involving the child of the parties. [Hughes] was convicted of violating a [p]rotection [o]rder.

Although the court found that Hughes "acted in a parental role to Mylez at one time" and "has continued some contact and . . . provided some degree of support," he failed to prove he had "assumed all obligations incident to the parental relationship." The court further considered Hughes' "continued efforts at contact with Mylez contrary to the consent of [Christensen]," as well as his actions toward Christensen, and the court also observed that Hughes had "fallen woefully short in minimizing [Mylez'] exposure to harmful parental conflict." As a result, the court dismissed Hughes' complaint, concluding that Hughes "failed to prove that continuing any in loco parentis status" was in Mylez' best interests.

Hughes appeals. Although Hughes was represented by counsel in limited scope in preparation of a brief to this court, Hughes appeared pro se at oral argument.

## ASSIGNMENTS OF ERROR

Hughes claims, restated and renumbered, that the district court erred in (1) finding that he was no longer in loco parentis to Mylez, (2) failing to grant him custody or visitation

rights, and (3) refusing to allow him to present evidence regarding Christensen's parental unfitness.

## STANDARD OF REVIEW

[1] Child custody determinations, and visitation determinations, are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Latham v. Schwerdtfeger*, 282 Neb. 121, 802 N.W.2d 66 (2011), *disapproved on other gorunds, Windham v. Griffin*, 295 Neb. 279, 887 N.W.2d 710 (2016).

[2] An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State on behalf of Daphnie F. v. Christina C.*, 310 Neb. 638, 967 N.W.2d 690 (2021).

## ANALYSIS

### In Loco Parentis Status

Hughes contends the district court erred in finding that he "did not have standing in loco parentis to pursue custody of [Mylez]." Brief for appellant at 16. However, the district court did not decide this case on standing grounds. Rather, the court found that Hughes "failed to prove that *continuing* any in loco parentis status [was] in Mylez' best interest." (Emphasis supplied.) In other words, the court necessarily found that Hughes had standing to bring an action seeking custody of or parenting time with Mylez, but that after being provided an opportunity to fully litigate the issue, Hughes failed to prove continuing his in loco parentis status was in Mylez' best interests.

[3-5] With regard to standing, the Nebraska Supreme Court has established that a claim for custody or parenting time by a nonparent may be brought by a common-law right to standing based on the doctrine of in loco parentis where the exercise of those rights is in the best interests of the child. See *Latham v. Schwerdtfeger, supra*. A person standing in loco parentis

to a child is one who has put himself or herself in the situation of a lawful parent by assuming the obligations incident to the parental relationship, without going through the formalities necessary to a legal adoption, and the rights, duties, and liabilities of such person are the same as those of the lawful parent. *Id*. But see *Windham v. Griffin, supra* (clarifying that common-law doctrine of in loco parentis does not confer same rights as those of lawful parent for all purposes; parental preference doctrine gives biological parent superior right to custody unless shown to be unfit or to have forfeited superior right to custody). The focus of an in loco parentis analysis must be on the relationship between the child and the party seeking in loco parentis status, examining what, if any, bond has formed between the child and the nonparent. See *Latham v. Schwerdtfeger, supra*.

[6,7] When considering the issue of standing in the context of in loco parentis, the Nebraska Supreme Court agreed with the reasoning of several other states, including this explanation from a Pennsylvania case:

"The in loco parentis basis for standing recognizes the need to guard the family from intrusions by third parties and to protect the rights of the natural parent must be tempered by the paramount need to protect the child's best interest. Thus, while it is presumed that a child's best interest is served by maintaining the family's privacy and autonomy, that presumption must give way where the child has established strong psychological bonds with a person who, although not a biological parent, has lived with the child and provided care, nurture, and affection, assuming in the child's eye a stature like that of a parent. Where such a relationship is shown, our courts recognize that the child's best interest requires that the third party be granted standing so as to have the opportunity to litigate fully the issue of whether that relationship should be maintained even over a natural parent's objection."

*Latham v. Schwerdtfeger*, 282 Neb. 121, 130, 802 N.W.2d 66, 73-74 (2011) (quoting *J.A.L. v. E.P.H.*, 453 Pa. Super. 78, 682 A.2d 1314 (1996)), *disapproved on other grounds, Windham v. Griffin*, 295 Neb. 279, 887 N.W.2d 710 (2016). The Nebraska Supreme Court further commented that the Pennsylvania case "went on to state that when the doctrine of in loco parentis is viewed in the context of standing principles in general, its purpose is to ensure that actions are brought only by those with a genuine substantial interest," and that "the doctrine must be applied flexibly and is dependent upon the particular facts of each case." *Latham v. Schwerdtfeger*, 282 Neb. at 130, 802 N.W.2d at 74. Once the doctrine of in loco parentis confers standing on the nonbiological parent, a full hearing is required on whether custody in favor of the individual with in loco parentis status is in the best interests of the minor child. See *id.* In other words, it is necessary to first assess the relationship established between the child and the individual seeking in loco parentis status to determine whether that person assumed the obligations incident to a parental relationship. See *id.* This initial inquiry "protects the family from allowing intervention by individuals who have not established an intimate relationship with the child" while at the same time "affording rights to a person who has established an intimate parent-like relationship with a child, the termination of which would not be in the best interests of the child." *Id.* at 131-32, 802 N.W.2d at 74-75. Once a party has demonstrated an intimate parent-like relationship with a child, "'courts recognize that the child's best interest requires that the third party be granted standing so as to have the opportunity to litigate fully the issue of whether that relationship should be maintained even over the natural parent's objection.'" *Id.* at 130, 802 N.W.2d at 74 (quoting *J.A.L. v. E.P.H., supra*).

[8-10] In this case, Hughes was granted standing to fully litigate the issue of whether his relationship with Mylez should be maintained even over Christensen's objection. However,

unlike biological and adoptive parenthood, the status of in loco parentis is temporary, flexible, and capable of being both suspended and reinstated. *Whilde v. Whilde*, 298 Neb. 473, 904 N.W.2d 695 (2017). Application of the in loco parentis doctrine depends upon the circumstances in existence when the nonparent claims a child's best interests lie in allowing him or her to exercise parental rights. *Id.* Once the person alleged to be in loco parentis no longer discharges all duties incident to the parental relationship, the person is no longer in loco parentis. See *id*. The district court concluded against continuing Hughes' in loco parentis status. And while we found Hughes to be sincere at oral argument about his genuine desire to maintain a relationship with Mylez and that he "just want[s] to be there for [his] son," we are unable to say that the district court abused its discretion in reaching its decision, as we discuss next.

Hughes presented evidence at trial that he had fostered a parent-like relationship with Mylez during the course of his relationship with Christensen. The district court acknowledged that Hughes "acted in a parental role to Mylez at one time" and "has continued some contact and . . . provided some degree of support." However, the court further observed that Hughes "failed to prove that he has assumed all obligations incident to the parental relationship and discharged all of those obligations." The court also pointed out that "[t]hrough [Hughes'] continued efforts at contact with Mylez contrary to the consent of [Christensen] as well as his actions towards [Christensen], [Hughes] has fallen woefully short in minimizing the child's exposure to harmful parental conflict."

In reaching its decision, the district court referenced Nebraska's Parenting Act, see Neb. Rev. Stat. § 43-2920 et seq. (Reissue 2016 & Cum. Supp. 2022), which offers guidance as to the obligations that the Legislature has deemed important to the parental relationship. The court also specifically referenced § 43-2922(17), which provides:

Parenting functions means those aspects of the relationship in which a parent or person in the parenting role makes fundamental decisions and performs fundamental functions necessary for the care and development of a child. Parenting functions include, but are not limited to:

(a) Maintaining a safe, stable, consistent, and nurturing relationship with the child;

(b) Attending to the ongoing developmental needs of the child, including feeding, clothing, physical care and grooming, health and medical needs, emotional stability, supervision, and appropriate conflict resolution skills and engaging in other activities appropriate to the healthy development of the child within the social and economic circumstances of the family;

(c) Attending to adequate education for the child, including remedial or other special education essential to the best interests of the child;

(d) Assisting the child in maintaining a safe, positive, and appropriate relationship with each parent and other family members, including establishing and maintaining the authority and responsibilities of each party with respect to the child and honoring the parenting plan duties and responsibilities;

(e) Minimizing the child's exposure to harmful parental conflict;

(f) Assisting the child in developing skills to maintain safe, positive, and appropriate interpersonal relationships; and

(g) Exercising appropriate support for social, academic, athletic, or other special interests and abilities of the child within the social and economic circumstances of the family.

Although there is evidence that Hughes engaged in some parenting functions related to Mylez for a period of time when cohabitating with Christensen, there is also evidence that his parenting role with Mylez diminished significantly once the

parties separated. From 2019 to the date of trial, Hughes made various attempts to provide Christensen with clothing and food for Mylez. Hughes also loaded $50 each week on a "Greenlight" card that he provided to Mylez. However, this support was minimal and often forced onto Christensen without her consent. Further, Hughes' relationship with Mylez diminished due to the lack of contact between the two. To the extent that Hughes attempted to maintain a relationship with Mylez, his attempts only served to further alienate Mylez from Hughes. For example, a social worker at Mylez' school testified that in the year prior to trial, the school issued a "stay away letter" to Hughes because he entered the school without permission in an attempt to contact Mylez. The social worker further testified that in that same year, Hughes attempted to approach Mylez just outside the school and she observed Mylez become concerned, "put his head down," and "try[] to walk away from [Hughes]." Hughes contends that these facts cannot be used against him because Christensen cut off the relationship between Mylez and him in 2019. However, the district court found that Christensen had "objective reasons supporting" her withholding of Mylez from Hughes, citing Hughes' convictions for attempted felony assault of Christensen, child neglect involving Rielle, and the protection order violation.

Regardless of whether it was Christensen's or Hughes' fault that the relationship between Hughes and Mylez was diminished, it is clear that Hughes failed to minimize Mylez' exposure to harmful parental conflict. Among Hughes' harassing and abusive behaviors toward Christensen, Hughes insulted Christensen in front of Mylez, made excessive frivolous reports to law enforcement about Christensen, and subjected her to surveillance. Although Hughes made some efforts to financially support Mylez from 2019 to the date of trial, those efforts are outweighed by the substantial evidence showing his role in exposing Mylez to harmful parental conflict.

Upon our review of the record, we cannot say the district court abused its discretion when it concluded that Hughes had failed to prove that continuing in loco parentis status was in Mylez' best interests. That said, nothing prevents Christensen and Hughes from setting aside their personal grievances and troubled history in an effort to improve their own relationship to better coparent their biological child, Rielle, and in doing so, perhaps rebuild enough trust for Christensen to consider allowing periodic contact between Hughes and Mylez, as she did in the past.

### Remaining Assignments of Error

Because our finding regarding the first assignment of error is dispositive, we are not required to address Hughes' remaining assignments of error, namely that the district court erred in failing to grant him custody or visitation rights and in refusing to allow him to present evidence regarding Christensen's parental unfitness. See *Lang v. Howard County*, 287 Neb. 66, 840 N.W.2d 876 (2013) (appellate court not obligated to engage in analysis not necessary to adjudicate case before it). We likewise decline to discuss Christensen's proposal that a higher burden for those seeking in loco parentis status should be established.

[11,12] However, because Hughes appeared at oral argument pro se and expressed that he should have been allowed to present evidence on Christensen's alleged unfitness, we take a moment to briefly address his argument. We first point out that a trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion. *Noah's Ark Processors v. UniFirst Corp.*, 310 Neb. 896, 970 N.W.2d 72 (2022). Further, a trial court has broad discretion to make evidentiary rulings conducive to the conduct of a fair and orderly trial. See *Putnam v. Scherbring*, 297 Neb. 868, 902 N.W.2d 140 (2017). In the present matter, regardless of the sufficiency of the pleadings, it was within

the trial court's discretion to decline to receive evidence on Christensen's fitness when Hughes' in loco parentis status had not yet been fully litigated. Christensen's parental fitness in the present case would have been relevant only upon the court's determination that the evidence supported the granting of in loco parentis status to Hughes.

## CONCLUSION

For the reasons set forth above, we affirm the district court's December 15, 2021, order dismissing Hughes' complaint.

AFFIRMED.