guage precluded coverage under the factual circumstances of the underlying tort action. We agree with the trial court's decision granting summary judgment in favor of Nationwide.

 Appellants also contend Nationwide waived the defense of exclusion 3 b(2) by failing to include it in its reservation of rights letter sent to its insured Paul C. Nixon, as a result of the October 10, 1993 accident, on December 28, 1993. Appellants argue "[i]t is apparent that Nationwide initially attempted to decline coverage based upon an inapplicable section of its policy and only later found another section on which to attempt to hang its hat". (Appellants' brief at 32.) Appellee Nationwide concedes it "inappropriately identified an inapplicable section of the policy" in its December 28, 1993 reservation of rights letter to the insured, but adds the letter *did* put its insureds on notice coverage would be denied. (Appellee's brief at 15.) Appellee also avers the insureds were not prejudiced by its misidentification of the clause upon which it planned to rely in support of its decision to deny coverage.

Appellants have provided this Court with no controlling caselaw in support of their position.[3] Furthermore, contained in appellants' reproduced record, at exhibit D, belying claims of prejudice, is correspondence from appellants' counsel to appellee, referring to a December 20, 1993 Nationwide letter wherein pages 7 and 8 of the policy were referenced in support of its denial of the Nixons' claim. Pages 7 and 8 of the policy contain the Use of Other Motor Vehicles section, as well as section 3 b(2), the clause upon which Nationwide has correctly relied in denying coverage. Lastly, as averred by appellee, appellants received notice of Nationwide's intended defense in its January 4, 1995 action for declaratory judgment, allowing appellants sufficient time within which to formulate an informed response. We find appellee's failure to include section 3 b(2) as a possible defense in its

reservation of rights letter denying coverage did not so prejudice appellants' ability to defend as to constitute reversible error.

Having found appellants' arguments devoid of merit, we affirm the Order granting summary judgment in favor of Nationwide.

Order affirmed.

**J.A.L., Appellant,**

v.

**E.P.H.**

Superior Court of Pennsylvania.

Argued May 23, 1996.

Filed Sept. 19, 1996.

---

**3.** Appellants' reliance on *Aetna Life and Casualty Co. v. McCabe,* 556 F.Supp. 1342 (E.D.Pa.1983), is misplaced as the facts therein are distinguishable from those before this Court.

Bernard D. Faigenbaum, Philadelphia, for appellant.

Joni J. Berner, Philadelphia, for appellee.

Before BECK, KELLY and BROSKY, JJ.

BECK, Judge:

We are asked to decide whether appellant J.A.L., the former lesbian life partner of appellee E.P.H., has standing to petition for partial custody of the child born to E.P.H. during their relationship. We conclude that the trial court erred in denying standing to J.A.L. Therefore, we reverse and remand for consideration of appellant's petition for partial custody.

Appellant J.A.L. and appellee E.P.H. entered into a lesbian relationship in 1980 and began living together as life partners in 1982, purchasing a home together in 1988. From quite early in the relationship, E.P.H. wished to have a child. Following several years of discussion, the parties agreed that E.P.H. would be artificially inseminated to attempt to conceive a child whom the parties would raise together. Together, E.P.H. and J.A.L. selected a sperm donor and made arrangements for a contract between E.P.H. and the donor whereby the donor relinquished his parental rights in any child E.P.H. might bear.

In August 1989, the insemination process began. The inseminations occurred in J.A.L.'s and E.P.H.'s home. For each insemination, the donor would produce the sperm in one room and J.A.L. would receive the sperm and take them to E.P.H. in another room, where J.A.L. would perform the insemination. This procedure was repeated several times each month until E.P.H. became pregnant in October, 1989, then resumed in 1990 after E.P.H. had a miscarriage in December, 1989. In September, 1990, E.P.H. again became pregnant. During the pregnancy, J.A.L. accompanied E.P.H. to doctor's visits and attended childbirth classes with her. E.P.H. successfully carried the child to term, and J.A.L., as well as two friends of E.P.H., was present at the birth of the child, G.H., in June, 1991. In registering the child's birth, E.P.H. gave J.A.L.'s surname as the child's middle name; E.P.H. subsequently had the child's middle name legally changed.

During E.P.H.'s pregnancy, E.P.H. and J.A.L. consulted with an attorney regarding the status of the child. The attorney prepared drafts of several documents for the parties' consideration. The first document was a Nomination of Guardian in which E.P.H. named J.A.L. as the guardian of the child in the event of E.P.H.'s death or disability. The document included the following statement:

This nomination is based on the fact that [J.A.L.] and I jointly made the decision that I should conceive and bear a child that we would then jointly raise. It is our intention that [J.A.L.] will establish from birth a loving and parental relationship with the child. Furthermore, my child will live with this adult from birth and will look to her for guidance, support and affection. It would be detrimental to my child to deprive my child of this established relationship at a time when I am unable to provide the security and care necessary to my child's healthy development.

The second document prepared for the parties was an Authorization for Consent to Medical Treatment of Minor, permitting J.A.L. to consent to medical or dental treatment of the child. The attorney also prepared a Last Will and Testament for each party, providing for the other party and the child. E.P.H.'s will also included a clause appointing J.A.L. as the guardian of the child, stating:

I have specifically and purposefully named [J.A.L.] as primary guardian of my child as I intend for the bond between my partner, [J.A.L.], and my child to be of primary importance and strength. [J.A.L.] and I jointly decided that I would conceive and bear my child. We intend to raise the child together as a family. It is my belief that the continuation of the parent-child relationship between [J.A.L.] and my child will be essential to my child's well-being, and that it will be in the child's best interests to remain with [J.A.L.].

The final document prepared by the attorney was a co-parenting agreement which set forth the parties' intention to raise the child together, to share the financial responsibility for the child, to make decisions about the child jointly, and for J.A.L. to become a *de facto* parent to the child. The agreement also provided that in the event of the parties' separation, they would share custody, continuing to make major decisions about the child jointly and splitting the financial responsibility for the child's support.

Shortly before the child's birth, the parties executed the nomination of guardian, the authorization for consent to medical treatment and the wills.[1] J.A.L. refused to execute the co-parenting agreement, which the attorney advised the parties was not enforceable in Pennsylvania.

After the birth, E.P.H., J.A.L. and the child lived together in the house owned by E.P.H. and J.A.L. E.P.H. was the primary caregiver to the child, but J.A.L. assisted with all aspects of the care of the baby, particularly during the first few weeks after the birth while E.P.H. recovered from a caesarean section. J.A.L. also cared for the baby alone from time to time when E.P.H. went out. During E.P.H.'s maternity leave, J.A.L. provided the primary financial support for the household, and throughout 1991 she continued to provide the majority of the household's income because E.P.H. initially returned to work only part-time.

In late 1991, serious problems developed in the relationship between E.P.H. and J.A.L., and in the spring of 1992, E.P.H. left the parties' home, taking the child with her and informing J.A.L. that she intended to raise the child as a single parent. For the first year of the separation, by agreement of the parties, J.A.L. took the child for visits twice a week, one on a weekday afternoon and the other for a full day on the weekend. During the second year of the separation, E.P.H. reduced the visits, still allowing one afternoon visit per week, but limiting the full-day weekend visits to once every two weeks. On the days of her visits, J.A.L. would pick up the child, who was then one to two years old, either from day care (for the weekday visits) or E.P.H.'s residence (for the weekend visits) and would return the child in the evening. During the visits, J.A.L. would feed the child, arrange for naps, provide toys and activities, and generally care for the child. Both parties testified that the child enjoyed and looked forward to these visits and felt an attachment to J.A.L. E.P.H. also testified that the child has similar visits and relationships with other adult "special friends."

1. These documents were revoked by E.P.H. after the parties' separation.

In April, 1994, E.P.H. advised J.A.L. that she no longer wished to have any contact whatsoever with J.A.L. and that she also wished to end the visits between J.A.L. and the child. E.P.H. testified that she took this action because she felt that J.A.L. was trying to establish a parental relationship with the child and to undermine E.P.H. as parent and that this could be harmful to the child. Although J.A.L. sought to continue seeing the child, the parties were unable to come to any agreement to continue J.A.L.'s visits, and in February, 1995, J.A.L. initiated this action for partial custody.

In response to J.A.L.'s complaint for partial custody, E.P.H. filed preliminary objections challenging J.A.L.'s standing. Following a hearing at which both parties and several other witnesses testified, the trial court granted the preliminary objections and dismissed the complaint for partial custody based upon J.A.L.'s lack of standing to bring such an action. This appeal followed.

■ In reviewing the trial court's determination, we are mindful of our proper scope and standard of review:

> [t]he scope of review of an appellate court reviewing a child custody order is of the broadest type; the appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*McMillen v. McMillen*, 529 Pa. 198, 202, 602 A.2d 845, 847 (1992) (citations omitted).

The trial court in this case determined that because J.A.L. was neither a biological nor an adoptive parent of the child, she must be viewed as a "third party" in her attempt to obtain partial custody and thus would have standing to seek custody only if she stood in loco parentis to the child. The court went on to conclude that J.A.L. did not stand in loco parentis to the child because E.P.H. never intended to grant her that status and J.A.L. understood that she was considered only to be a friend, not a parent, of the child. Accordingly, the trial court held that J.A.L. lacked standing to seek partial custody of the child. We hold that the trial court's application of the concept of standing in this custody matter was overly technical and mechanistic and that it was error to preclude J.A.L. from seeking a judicial determination of her claim for partial custody of the child.

■ The concept of standing, an element of justiciability, is a fundamental one in our jurisprudence: no matter will be adjudicated by our courts unless it is brought by a party aggrieved in that his or her rights have been invaded or infringed by the matter complained of. *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 464 Pa. 168, 346 A.2d 269 (1975); *In re Mengel*, 287 Pa.Super. 186, 429 A.2d 1162 (1981). The purpose of this rule is to ensure that cases are presented to the court by one having a genuine, and not merely a theoretical, interest in the matter. Thus the traditional test for standing is that the proponent of the action must have a direct, substantial and immediate interest in the matter at hand. *William Penn Parking Garage, Inc. v. City of Pittsburgh, supra*. See also *Chester County Children and Youth Services v. Cunningham*, 540 Pa. 258, 656 A.2d 1346 (1995) (Opinion in Support of Reversal by Montemuro, J.). It is not enough that the proponent merely share in the common interest of all citizens in ensuring obedience to our laws. *Id.* Issues of standing thus require us to resolve "the basically simple problem of whether or not petitioner's asserted interest is in the circumstances deserving of legal protection." K.C. Davis, *Administrative Law*, (1951) at 714, *quoted in In re Mengel, supra* at 189, 429 A.2d at 1164.

■ In the area of child custody, principles of standing have been applied with par-

ticular scrupulousness because they serve a dual purpose: not only to protect the interest of the court system by assuring that actions are litigated by appropriate parties, but also to prevent intrusion into the protected domain of the family by those who are merely strangers, however well-meaning. *See Jackson v. Garland,* 424 Pa.Super. 378, 622 A.2d 969 (1993); *Commonwealth ex rel. Ebel v. King,* 162 Pa.Super. 533, 58 A.2d 484 (1948). Thus in custody cases it has been held that an action may be brought only by a person having a "prima facie right to custody." *E.g., Van Coutren v. Wells,* 430 Pa.Super. 212, 633 A.2d 1214 (1993); *Helsel v. Blair County Children and Youth Services,* 359 Pa.Super. 487, 519 A.2d 456 (1986).

█ Biological parents have a prima facie right to custody, but biological parenthood is not the only source of such a right. Cognizable rights to seek full or partial custody may also arise under statutes such as Chapter 53 of the Domestic Relations Code, 23 Pa.C.S. §§ 5311 *et seq.* (permitting grandparents and greatgrandparents to seek visitation or partial custody of their grandchildren or great grandchildren), or by virtue of the parties' conduct, as in cases where a third party who has stood in loco parentis has been recognized as possessing a prima facie right sufficient to grant standing to litigate questions of custody of the child for whom he or she has cared. *See, e.g., Rosado v. Diaz,* 425 Pa.Super. 155, 624 A.2d 193 (1993); *Karner v. McMahon,* 433 Pa.Super. 290, 640 A.2d 926 (1994).

█ It is important to recognize that in this context, the term "prima facie right to custody" means only that the party has a colorable claim to custody of the child. The existence of such a colorable claim to custody grants standing only. In other words, it allows the party to maintain an action to seek vindication of his or her claimed rights. A finding of a prima facie right sufficient to establish standing does not affect that party's evidentiary burden: in order to be granted full or partial custody, he or she must still establish that such would be in the best interest of the child under the standards applicable to third parties.

█ Thus the use of the term "prima facie right to custody" in a standing inquiry must be distinguished from the use of that term in the context of determining custody rights as between a parent and a non-parent. In this latter context, the natural parent's prima facie right to custody has the effect of increasing the evidentiary burden on the non-parent seeking custody. *Ellerbe v. Hooks,* 490 Pa. 363, 416 A.2d 512 (1980); *In re Hernandez,* 249 Pa.Super. 274, 376 A.2d 648 (1977). *See Campbell v. Campbell,* 448 Pa.Super. 640, 672 A.2d 835 (1996) (natural mother confused principles of standing with standard to be applied in deciding custody dispute); *Walkenstein v. Walkenstein,* 443 Pa.Super. 683, 663 A.2d 178 (1995) (same). Appropriate deference to the parent's right to custody thus does not require that all third parties be denied standing, or even that standing rules be applied in an overly stringent manner; the increased burden of proof required of third parties seeking custody rights provides an additional layer of protection for the parent. *See Kellogg v. Kellogg,* 435 Pa.Super. 581, 586–88, 646 A.2d 1246, 1249 (1994); (third parties who establish standing by virtue of *in loco parentis* are not elevated to status of natural parent in determining merits of custody dispute); *Commonwealth ex rel. Patricia L.F. v. Malbert J.F.,* 278 Pa.Super. 343, 420 A.2d 572 (1980) (same).[2]

█ The in loco parentis basis for standing recognizes that the need to guard the

2. We note that in *Rowles v. Rowles,* 542 Pa. 443, 668 A.2d 126 (1995), the Pennsylvania Supreme Court reexamined the appropriate standard of proof in custody disputes between a parent and a non-parent. The Opinion Announcing the Judgment of the Court sought to abandon the presumption in favor of the parent in such cases, instead treating parenthood as a significant, although not paramount, factor in determining custody. *Id.* at 446–48, 668 A.2d at 128. That view, however, failed to command a majority of the court, and as a result, *Ellerbe, supra,* which recognized the presumption, remains the law of this Commonwealth. *See Mollander v. Chiodo,* 450 Pa.Super. 247, —— n. 1, 675 A.2d 753, 755 n. 1 (1996). Dictum by this court in *Campbell, supra,* suggesting that *Rowles* changed the stan-

family from intrusions by third parties and to protect the rights of the natural parent must be tempered by the paramount need to protect the child's best interest. Thus, while it is presumed that a child's best interest is served by maintaining the family's privacy and autonomy, that presumption must give way where the child has established strong psychological bonds with a person who, although not a biological parent, has lived with the child and provided care, nurture, and affection, assuming in the child's eye a stature like that of a parent. Where such a relationship is shown, our courts recognize that the child's best interest requires that the third party be granted standing so as to have the opportunity to litigate fully the issue of whether that relationship should be maintained even over a natural parent's objections.

■ Although the requirement of in loco parentis status for third parties seeking child custody rights is often stated as though it were a rigid rule, it is important to view the standard in light of the purpose of standing principles generally: to ensure that actions are brought only by those with a genuine, substantial interest. When so viewed, it is apparent that the showing necessary to establish in loco parentis status must in fact be flexible and dependent upon the particular facts of the case. Thus, while unrelated third parties are only rarely found to stand in loco parentis, step-parents, who by living in a family setting with the child of a spouse have developed a parent-like relationship with the child, have often been assumed without discussion to have standing to seek a continued relationship with the child upon the termination of the relationship between the step-parents. *See, e.g., Commonwealth ex rel. Patricia L.F. v. Malbert J.F., supra* (considering, but denying on the merits, step-parent's claim for custody); *Auman v. Eash,* 228 Pa.Super. 242, 323 A.2d 94 (1974) (same). Where the issue of a step-parent's standing has been directly addressed by this court, standing has been found to exist because the step-parents stood in loco parentis to the child or children in question. *Karner v. McMahon, supra; Spells v. Spells,* 250 Pa.Super. 168, 378 A.2d 879 (1977).

In addition, we have suggested that where a petitioner who is not biologically related to the child but has established a parent-like relationship with the child seeks not to supplant the natural parent, but only to maintain his relationship with the child through reasonable visitation or partial custody, his burden to establish standing is easier to meet. *See Commonwealth ex rel. Patricia L.F. v. Malbert J.F., supra* at 346–348, 420 A.2d at 574.

■ In today's society, where increased mobility, changes in social mores and increased individual freedom have created a wide spectrum of arrangements filling the role of the traditional nuclear family, flexibility in the application of standing principles is required in order to adapt those principles to the interests of each particular child.[3] We do not suggest abandonment of the rule that

dard of proof in such cases is not binding upon this court or the trial courts. Moreover, even if the position espoused by the lead opinion in *Rowles* becomes law, the more flexible standard employed in that case would still grant some special protection to the parent in custody disputes with non-parents.

**3.** *See generally,* Katherine T. Bartlett, *Rethinking Parenthood as an Exclusive Status: The Need for Legal Alternatives When the Premise of the Nuclear Family Has Failed,* 70 Va.L.Rev. 879 (1984); Nancy D. Polikoff, *This Child Does Have Two Mothers: Redefining Parenthood to Meet the Needs of Children in Lesbian–Mother and Other Nontraditional Families,* 78 Geo.L.J. 459 (1990); Elizabeth A. Delaney, *Statutory Protection of the Other Mother: Legally Recognizing the Relationship Between the Nonbiological Lesbian Parent and Her Child,* 43 Hastings L.J. 177 (1991).

Courts in several of our sister states which have addressed the issue of the standing of nonbiological parents have concluded that protection of the best interest of the child may require that traditional standing concepts be adapted to fit modern social patterns. *See e.g., A.C. v. C.B.,* 113 N.M. 581, 829 P.2d 660 (Ct.App.1992) (former lesbian partner who had entered into oral coparenting agreement had colorable claim to joint legal custody and time-sharing of partner's biological child); *In re the Custody of H.S.H.–K.: Holtzman v. Knott,* 193 Wis.2d 649, 533 N.W.2d 419 (1995) (although former lesbian partner does not meet requirements of visitation statute, court

a petitioner for custody who is not biologically related to the child in question must prove that a parent-like relationship has been forged through the parties' conduct. However, we hold that the fact that the petitioner lived with the child and the natural parent in a family setting, whether a traditional family or a nontraditional one, and developed a relationship with the child as a result of the participation and acquiescence of the natural parent must be an important factor in determining whether the petitioner has standing. Additionally, where only limited custody rights are sought, the limited nature of the intrusion into the biological family must be considered in deciding whether standing has been made out.

As the trial court in this case properly noted, appellant J.A.L. can be granted standing, if at all, only as a third party who has stood in loco parentis to E.P.H.'s child. However, the trial court erred in applying that standard to the facts of this case and thus abused its discretion in denying J.A.L. standing to pursue her claim for partial custody.

██ The facts as found by the trial court clearly indicate that E.P.H. and J.A.L. had lived together not merely as roommates or friends, but as a nontraditional family, for many years before the birth of the child. E.P.H.'s own testimony establishes that although she had long wished to have a child, she did not do so until J.A.L. agreed, and thereafter the parties acted together to make arrangements for the artificial inseminations. The inescapable conclusion to be drawn from this evidence is that in both E.P.H.'s and J.A.L.'s minds, the child was to be a member of their nontraditional family, the child of both of them and not merely the offspring of E.P.H. as a single parent. This intention is borne out by the documents executed by the parties before the child's birth and by E.P.H.'s conduct in giving the child J.A.L.'s surname as a middle name on the birth certificate. Clearly, the parties contemplated that J.A.L. would be in a parent-like relationship with the child and took some pains to formalize that relationship to the extent legally possible.[4]

The parties' conduct after the child's birth and before their separation further establishes their efforts to create a parent-like relationship between J.A.L. and the child. J.A.L. participated in caring for the child to the same extent as the primary breadwinner in many traditional families. The fact that E.P.H. was the child's primary caregiver, or that other friends also helped out with the new baby, does not diminish the fact that J.A.L. lived with the child for the first ten months of its life, acting as a parenting partner to the child's mother and creating the

---

may determine whether visitation is in child's best interest if petitioner proves parent-like relationship and significant triggering event justifying state intervention in relationship between biological parent and child). *But see Curiale v. Reagan,* 222 Cal.App.3d 1597, 272 Cal.Rptr. 520 (1990) (under statutory definition of parent, nonbiological parent in same-sex relationship had no standing to seek custody/visitation of partner's biological child conceived during relationship despite co-parenting agreement).

**4.** Both parties testified that adoption was not considered because the legal validity of such "second parent" adoptions had not been tested in Pennsylvania and many states hold that such adoptions cannot go forward unless the parental rights of the biological mother are terminated. *See generally,* Sonja Larsen, Annotation, *Adoption of Child by Same-Sex Partners,* 27 A.L.R. 5th 54 (1995). The parties testified that such adoptions are not now uncommon in Philadelphia. We note, however, that the appellate courts of the commonwealth still have not spoken on their validity. We do not find the failure to pursue this option as detracting in any way from the evidence of the parties' efforts to formalize the relationship between J.A.L. and the child.

Similarly, we do not find J.A.L.'s refusal to execute the draft co-parenting agreement a sufficient basis upon which to defeat her claim of standing to seek partial custody. J.A.L. was advised that the agreement would not be enforceable, and her stated reason for refusing to sign the agreement was that it was worthless. Nothing in her conduct at the time the draft was presented to her or thereafter indicated that she declined to sign the agreement because she did not wish to enter into a parent-child relationship with E.P.H.'s child.

opportunity for bonding to occur.[5] This early contact was reinforced by visits after the parties' separation, visits which occurred with a frequency and regularity similar to that of post-separation visits by many non-custodial natural parents and thus must be considered adequate to maintain any bond previously created. The evidence at trial clearly established that J.A.L. has shown a constant, sincere interest in the child, and that the child recognizes J.A.L. as a significant person in her life.

 We have no difficulty in concluding that these facts sufficiently establish a parent-like relationship between J.A.L. and the child to grant J.A.L. standing to pursue the partial custody rights she seeks. The trial court placed great emphasis on E.P.H.'s subjective thought processes, noting that E.P.H. had doubts as to whether J.A.L. really wanted the child and that upon the parties' separation, E.P.H. intended to raise the child as a single parent, with J.A.L. assuming a status of "special friend." E.P.H.'s doubts and post-separation intentions, however, are irrelevant to the question of whether the parties by their conduct created a parent-like relationship between J.A.L. and the child which is sufficient to give J.A.L. standing to seek continued contact with her. E.P.H.'s rights as the biological parent do not extend to erasing a relationship between her partner and her child which she voluntarily created and actively fostered simply because after the parties' separation she regretted having done so.[6]

We hold that the evidence of record in this matter, particularly the evidence that J.A.L. and the child were co-members of a nontraditional family, is sufficient to establish that J.A.L. stood in loco parentis to the child and therefore has standing to seek partial custody. Accordingly, we remand for a full custody hearing to determine whether partial custody by J.A.L. is in the child's best interest.[7]

Order reversed. Case remanded for further proceedings consistent with this Opinion. Jurisdiction is relinquished.

---

**5.** The suggestion by E.P.H. that the fact that J.A.L. lived with the child for only ten months precludes her from having in loco parentis status is meritless. The ten months that J.A.L. lived in a family setting with E.P.H. and the child constituted the child's entire life to that point. *See Wilson v. Wilson*, 406 Pa.Super. 473, 476–78, 594 A.2d 717, 719 (1991) (foster parents were not barred from establishing in loco parentis status despite short period of time [under two years] of child's placement with them where child had been *in esse* for less than two years).

**6.** The trial court also opined that J.A.L.'s effort to establish in loco parentis status must fail because E.P.H. did not wish her to have a parent-like status. The trial court correctly noted that a third party cannot place himself in loco parentis status in defiance of the parent's wishes and the parent/child relationship, *Gradwell v. Strausser*,

416 Pa.Super. 118, 610 A.2d 999 (1992). However, the record in this case clearly establishes that, at the time of the child's birth, E.P.H. wished J.A.L. to assume a parental status, and facilitated the development of a parent-child bond between J.A.L. and the baby. The only evidence of E.P.H.'s wish to prevent J.A.L. from further developing this bond relates to the period following the parties' separation. Thus J.A.L.'s relationship with the child was not created in defiance of the biological parent's rights or wishes.

**7.** We emphasize once again that our determination today does not change the standard applicable to J.A.L.'s claim for partial custody as against the child's biological parent. J.A.L., although in loco parentis for standing purposes, remains a third party for purposes of evaluating her claim for partial custody. *Kellogg v. Kellogg, supra.*