J-A27006-24

2025 PA Super 31

| | | |
|---|---|---|
| A.C. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| E.K. | : | |
| | : | |
| Appellant | : | No. 717 MDA 2024 |

Appeal from the Order Entered April 25, 2024
In the Court of Common Pleas of Centre County Civil Division at No(s):
2023-1464

BEFORE:  LAZARUS, P.J., KUNSELMAN, J., and McLAUGHLIN, J.

OPINION BY LAZARUS, P.J.:                    **FILED: FEBRUARY 12, 2025**

E.K. appeals from the order, entered in the Court of Common Pleas of Centre County, sustaining Appellee A.C.'s (Mother) preliminary objections and dismissing E.K.'s counterclaim for custody, finding that that E.K. did not stand *in loco parentis* with respect to Mother's minor child, C.C. (Child) (born May 2019).  After careful review, we affirm.

Mother is an associate professor at the Pennsylvania State University—State College.  She holds an undergraduate degree from Stanford University in the practice of art and African-American studies, as well as masters and doctoral degrees from the University of California, Berkeley, in African Diaspora studies with a designated emphasis in women, gender, and sexuality.  E.K. has a degree in philosophy and is a self-employed real estate developer who owns a company that restores historic, blighted properties in the Philipsburg area.

In 2017, prior to meeting E.K., Mother began the *in vitro* fertilization process to conceive Child. Mother had a history of fertility issues, including several miscarriages prior to conceiving Child. On November 27, 2017, Mother executed a contract with a fertility clinic and began receiving fertility treatments, including fertilization of her eggs with donor sperm, not E.K. Those fertilized eggs, which later became embryos, were frozen.

Mother and E.K. met in late-February 2018. In July 2018, Mother informed E.K. that she was undergoing *in vitro* fertilization treatments[1] to conceive a child. In August 2018, Child's embryo was implanted in Mother. In late September/early October 2018, E.K. moved into Mother's State College residence,[2] although he retained his own Centre County residence located approximately 19 minutes away in Lemont.

Mother gave birth to Child in May 2019. E.K. is not the biological father of Child. Child has always referred to E.K. by his first name. *See* N.T. Hearing, 1/5/24, at 34. Mother and E.K. were never engaged or married. *Id.* at 19.

At a hearing to determine whether E.K., as a third party, had standing to seek custody of Child, E.K. testified that about four months into his

_____

[1] E.K. testified that at this time, the embryo had not yet been implanted in Mother. *See* N.T. Hearing, 1/5/24, at 49. Mother testified that at the time she met E.K., the embryo, that would later be implanted in her after she started her relationship with E.K., had already been frozen. *See* N.T. Hearing, 3/27/24, at 24. Mother also testified that she had one unsuccessful implantation prior to the successful implantation of Child. *Id.* at 38.

[2] E.K. testified that his name was not on the deed to Mother's house. *See* N.T. Hearing, 1/5/24, at 125.

relationship with Mother, in late June/early July 2018, she shared with him that she had started "taking preliminary steps towards achieving an *in vitro* fertilization." *Id.* at 10. E.K. further testified that Mother "told [him] she would stop [the process] if [he] wanted her to . . . [that s]he gave [him] that veto power." *Id.* E.K. stated that he told Mother he "would be there for her; that he would support her and that together as a couple . . . [they] would take this step-by-step [and] embark on this journey of starting a family together." *Id.* *See also id.* at 19 (E.K. testifying that although Mother and he had an "unusual" family dynamic, they "were a very typical family [where he was] the father, [A.C.] was the mother, and it was just sort of a traditional household where [he] was sort of the man of the house and would take on those traditional responsibilities").

E.K. was in the delivery room at the time Mother delivered Child, along with Child's maternal grandmother and Mother's best friend. Maternal grandmother cut Child's umbilical cord. Mother is the only parent listed on Child's birth certificate. After Child was born, E.K. testified that he "was present at the house every day . . . [for about] 95 percent of the days for the first four years of [Child's] life," that they "were 100 percent a team . . . raising a beautiful little girl together." *Id.* at 16, 25. E.K. testified that he supported Mother emotionally "100 percent" after Child's birth, including finding online resources to help Mother with Child's sleep issues and "advocating for a sleep trainer." *Id.* at 22-24.

E.K. testified that he did "all of the things[,] day in, day out regularly" for Child, including buying diapers and changing diapers, potty training, taking her to the bathroom, taking her on skiing outings, walks and hikes, taking her to the parks and playgrounds around town, reading her bedtime stories "every night," reading to Child on a "daily basis," sleep training, preparing her food, going grocery shopping for the household, taking Child to/from daycare, taking her to dance class, soccer practice, and swimming classes, and watching videos with Child. *Id.* at 16-17, 22-24, 31-35, 38, 148-49. E.K. testified that, without Mother's objection, he performed "100 percent" of the household maintenance that "a typical spouse might do," including plumbing, electrical projects, cutting down trees, taking out the trash, taking the dog out every morning, childproofing, pressure washing the deck, and painting. *Id.* at 18. E.K. also testified that he "bought a ton of toys" for Child, that he was home "every weekend[,]" and that once Child was born, "he started coming home early every day." *Id.* at 19-21.

E.K. testified that he and Child had a "deep bond . . . that is of a father and daughter [who] love each other deeply." *Id.* at 29; *id.* at 34 ("I was a dad. [Child would] refer [to me] as E[.], but I was a dad."). E.K. testified that Mother "encouraged" E.K. to do story time with Child at bedtime. *Id.* at 32. E.K. also testified that he would play all kinds of games with Child, including jumping on the trampoline, playing hide and seek, playing with her dollhouse, and playing make-believe games like acting out Disney characters. *Id.* at 34, 38. E.K. testified that Child flew with Mother to Florida to attend

E.K.'s sister's wedding in June 2022, and to visit E.K.'s parents twice. ***Id.*** at 37-38. One of Child's visits to Florida occurred over Christmas, when she spent the holiday with E.K.'s parents, siblings, and E.K.'s brother in-law. ***Id.*** at 222. E.K.'s father, an anesthesiologist, testified that he worked in a Johnstown, Pennsylvania hospital 10-12 weeks a year. ***Id.*** at 213. When he was working in Pennsylvania, E.K.'s father testified he would visit Mother, Child and E.K. "[a]lmost every day" and that the atmosphere in the house "was just like a family." ***Id.*** at 205. E.K. also testified that Child called E.K.'s mother "Beste," which means grandmother in Danish, and stated that Child and his mother are "really close." ***Id.*** at 69. E.K.'s father, whom Child called "E[.]DD," testified that he loved Child as a grandchild, referred to her as a grandchild, and that he "had a lot of joy being with her and [wished] he could see her more." ***Id.*** at 208. Finally, E.K.'s father testified that E.K. acted "just like a father" to Child, that Child "was always asking for [E.K.], and that Child "always wanted [E.K.] to read her a story at night." ***Id.*** at 209.

Mother testified that she never thought of E.K. as a father to Child. Specifically, she stated that: she did not ask E.K. to attend and he, in fact, did not attend any of Mother's fertility clinic visits, pre-natal appointments, or childbirth classes when Mother was pregnant with Child; E.K. is not Child's guardian or a trustee of Mother's trust created for Child prior to her birth; E.K. never had a car seat in his vehicle before the parties' other child was born; E.K. only dressed Child "occasionally" as an infant; E.K. never attended medical appointments for Child; E.K. "changed [Child's] diaper maybe a

handful of times;" E.K. did not "active[ly] potty train" Child; E.K. did not attend tours of daycares; E.K. vacationed often without Mother and Child; and E.K. only "occasionally" drove Child to daycare. *Id.*, 3/27/24, at 40-83, 89, 131-32, 165, 181. Mother also testified that when Child was an infant, E.K. would help Mother "with occasional items . . . like hold[ing Child] or giv[ing Mother] a break while [she] would . . . go to the bathroom or take a shower or get something to eat." *Id.* at 84.

Mother also testified that E.K. would take Child for walks when she got older, would try to soothe Child when she was crying, and often bought Child gifts on holidays and birthdays.[3] *Id.* at 84-85, 126. Mother testified that as Child got older, she allowed E.K. to take Child skiing four to five times at Tussey Mountain, pick Child up from daycare on those days, and read her nightly stories at bedtime.[4] *Id.* at 125-26, 192-93. Mother testified that E.K. did not pay for costs associated with Child's medical, dental, or vision care, Mother's IVF treatment for Child, or medical bills while Mother was pregnant with Child. *Id.* at 90-96. Mother testified that E.K. never specifically cooked for Child but would offer Child some of the food that he made for himself, and

_____

[3] Mother testified that while she thought E.K. had bought a trampoline and swings for Child when he was living at Mother's house, E.K. sent Mother an email in August 2023, telling Mother that he would be coming to pick up "his" trampoline and swing. *Id.* at 128.

[4] Mother testified that she permitted E.K., among others, to pick Child up from daycare by putting his name on a consent form. *Id.* at 181-82. Mother testified that during COVID, E.K. more regularly picked Child up from daycare. *Id.* at 182.

that while he looked for solutions on the internet to help Mother with Child's sleeping issues, he did not make any arrangements to hire a sleep trainer. *Id.* at 100, 108-09. Mother testified that she felt that "the intensity with which [E.K.] approached story [] time with [Child] chang[ed] as [Mother's] relationship [with E.K.] got more conflicted and more precarious." *Id.* at 194.

With regard to whether they were considered a family unit, Mother testified that she never considered herself and E.K. as a "parenting team" and that she never "consent[ed] for him to be [Child's] parent[,] didn't chose for him to be [Child's] parent[,] didn't empower him in any way to act as [Child's] parent in any significant way[, and] actively told him that he wasn't [Child's] father on many occasions." *Id.* 114. *See id.* at 115-16 (Mother testifying when E.K. lived with her and Child she "consistent[ly] and articulate[ly]" told E.K. he was not Child's father); *see also id.* at 117-18 (email from E.K. to Mother, entered as Plaintiff's Exhibit 46, stating, "[i]t's been hurtful to hear you say you do not want me to be [Child's] father. I'm asking you to reconsider for [Child's] sake."). In fact, when Mother found out that E.K. had listed himself as the primary contact for Child's YMCA swimming class, Mother emailed the aquatic director and sent her a new form removing E.K. and listing herself as the only contact for Child's swimming lessons. *Id.* at 142. *See also id.* at 168 (following daycare incident involving Child, Mother informed assistant director of daycare that "in the future all waivers need [to be signed by her and not E.K.]"); N.T. Deposition of Stacey Annette Brobst, 3/21/24, at 9-30 (Child's supervising teacher at daycare, from May 2022 to March 2024,

testifying only Mother attended Child's parent-teacher conferences, filled out Child's developmental paperwork/questionnaires, made decisions with regard to Child, received emails from daycare, or went to programs at school, and was listed as only parent/guardian on emergency contact list).

In January 2023, Mother and E.K. had a child together, I.F.K.C. I.F.K.C. was also conceived via *in vitro* fertilization, this time using a donor egg and E.K.'s sperm. Although not I.F.K.C.'s biological mother, Mother is I.F.K.C.'s gestational carrier. E.K. lived with Mother from October 2018 until mid-April 2023, when Mother told E.K. to move out of her home. Mother testified she asked E.K. to move out because she "felt like the environment in the house was not good . . . and she didn't want to be raising two people in that environment." N.T. Hearing, 3/27/24, at 115.

After E.K. moved out, Mother permitted E.K. to see Child a couple nights a week for an hour or two. *See* N.T. Hearing, 1/5/24, at 27. Eventually, those visits tapered off until July 2, 2023, when Mother stopped permitting E.K. to see Child altogether. *Id.* at 28. E.K. testified that he "repeated[ly] and regularly" asked Mother to see Child. *Id.* at 44-47. (E.K. testifying to emails he sent Mother on July 4, July 5, July 8, July 10, July 11, July 14, July 16 asking when he could see Child again). According to E.K., Mother never outright told E.K. that he could never see Child again, but, instead, would engage in a kind of "doublespeak that is difficult to comprehend." *Id.* at 50-51. E.K. testified that he last saw Child when he randomly bumped into Child and Mother on the street on October 13, 2023. *Id.* at 52. *See id.*, 3/27/24,

at 195-96 (Mother testifying after April 21, 2023, when E.K. no longer lived with her, she "did[ no]t permit him to spend any time with just [Child] at all after that time[, but] allow[ed] some contact . . . for them to hang out and socialize a little bit" in the evening at her house); *id.* at 198 (Mother testifying she would "occasionally" meet E.K. out at dinner with Child after he moved out of her house). Twelve days later, on October 25th, Mother texted E.K. on the "OurFamilyWizard" application that he could no longer contact or see Child.

On June 29, 2023, Mother filed a complaint against E.K. seeking shared legal custody and primary physical custody of I.F.K.C. On July 20, 2023, following a court conference, the court entered an order giving the parties shared legal custody of I.F.K.C., granting Mother primary physical custody of I.F.K.C., and giving E.K. periods of physical custody of I.F.K.C.[5] On October 24, 2023, E.K. filed an answer and counterclaim to Mother's custody complaint, seeking shared legal and physical custody of Child, whom he averred was "born out of wedlock[, but noted that while he and Mother] have never been married, [they] were in a relationship and living together for approximately six (6) months prior to [Child's] conception." E.K.'s Answer and Counterclaim, 10/24/23, at ¶¶ 20-21. In addition, E.K.'s counterclaim alleged that:

---

[5] E.K. had physical custody of I.F.K.C. every Monday, Wednesday, and Friday from 12:00PM-3:00PM and every other weekend beginning July 2, 2023, from 12:00PM to 3:00PM and 4:00PM to 6:00PM on Saturday and Sunday.

21. [Child] was conceived via IVF with a sperm donor. The parties were living together at the time of [Child's] birth and continued to live together until [Child] was approximately [four] years old.

22. [E.K.] consented to and was supportive of Mother's choice to conceive [Child].

23. [E.K.] was in the room at the time of [Child's] birth. [E.K.] changed [Child's] diaper and assisted Mother in nearly all aspects of caring for [Child] since [Child's] birth.

* * *

26. [E.K.], while not the biological father of [Child,] stands *in loco parentis* to [Child] and is entitled to seek custody of [Child] under 23 Pa.C.S.[A.] § 5324(b), which provides that "[[a] person who stands *in loco parentis* to the child may file an action . . . for any form of physical custody or legal custody."

27. [E.K.] has assumed the obligations incident to the parental relationship with respect to [Child] has provided care, nurture, and affection, and has assumed a stature like that of a parent to Child].

28. [E.K.] believes and therefore avers that [Child's] best interest will be served by the parties sharing legal custody and physical custody of [C]hild.

*Id.* at ¶¶ 21-23, 26-28.

Mother filed preliminary objections challenging E.K.'s counterclaim for custody of Child on the grounds that he lacked standing because E.K. "does not stand *in loco parentis* to [Child]" and requested the court schedule an evidentiary hearing on the matter. Mother's Preliminary Objections, 11/7/23, at ¶¶ 9, 16. **See** Pa.R.C.P. 1028(a)(5) (preliminary objections based on lack of capacity to sue). "In direct contradiction to the facts alleged in [E.K.'s] Counterclaim," Mother averred the following:

a. Mother and [E.K.] did not intend for [E.K.] to be a parent of [Child];

b. Mother did not seek [E.K.'s] "consent" to Mother's efforts to birth [Child] via alternative reproductive technologies, which in fact she started significantly before even meeting [E.K.];

c. [E.K.] is not listed on [Child's] birth certificate;

d. [Child] does not bear [E.K.'s] last name;

e. [E.K.] was never named as a guardian for [Child] in the event Mother could not care for [C]hild;

f. Mother never suggested [E.K.] adopt [Child];

g. Mother and [E.K.] never took any steps to formalize a co-parenting agreement relative to [Child];

h. [E.K.] was involved in the life of [Child] merely as Mother's significant other;

i. All interactions between [E.K.] and [Child] were incident to Mother's relationship with [E.K.];

j. [E.K.] has provided no financial support for [Child], from conception to the present date;

k. [E.K.] did not assume a key caretaking, financial, parental or decision[-]making role in [Child's] life; and

l. In the eyes of [Child], [E.K.] has not assumed the stature of a parent.

Mother's Preliminary Objections, 11/7/23, at ¶¶ 18(a.-l.). E.K. filed a response to Mother's preliminary objections, disputing her allegations that he did not stand *in loco parentis* to Child. **See** E.K.'s Response to Preliminary Objections, 1/27/23, at ¶¶ 1, 3, 17-18.

Following three days of hearings held in January, March and April 2024, the court sustained Mother's preliminary objections and dismissed E.K.'s counterclaim for custody of Child, concluding that that E.K. did not stand *in loco parentis* with respect to Child.

E.K. filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. E.K. raises the following issues for our consideration:

(1)    Whether the [t]rial [c]ourt committed an error of law in its application of the current state of the law and its analysis of 23 Pa.C.S.[A.] § 5324(2).

(2)    Whether the [t]rial [c]ourt erred in finding that [E.K.] does not stand *in loco parentis* status to [C]hild.

(3)    Whether the [t]rial [c]ourt erred in finding that [E.K.] did not develop or assume a father-child relationship with [C]hild for *in loco parentis* purposes under 23 Pa.C.S.[A.] § 5324(2) and, instead, only discharged duties ancillary to his role as Mother's live-in boyfriend.

(4)    Whether the [t]rial [c]ourt erred when it failed to apply the law and issued a finding that is contrary to the evidence established at trial which demonstrates [E.K.], Mother, and [C]hild lived in a family setting as a unit.

Appellant's Brief, at 4.

Typically, absent a *prima facie* right to custody, a third party lacks standing to seek custody as against the natural parent. ***Gradwell v. Strausser***, 610 A.2d 999, 1002 (Pa. Super. 1992). The exception to this third-party-lack-of-standing preclusion is proof that such a party stands *in loco parentis*, that is, where he or she has assumed obligations incident to the parental relationship. ***Id.*** Pennsylvania's child custody statute, 23 Pa.C.S.A. 5324(2), specifically authorizes a person who stands *in loco parentis* to commence a custody action. Section 5324 states, in relevant part:

> The following individuals may file an action under this chapter for any form of physical custody or legal custody:
>
> (1) A parent of the child.

- 12 -

> (2) **A person who stands *in loco parentis* to the child.**
>
> (3) A grandparent of the child who is not *in loco parentis* to the child[.]

23 Pa.C.S.A. § 5324 (emphasis and italics added).

Threshold issues of standing are questions of law; thus, our standard of review is *de novo* and our scope of review is plenary. **K.W. v. S.L.**, 157 A.3d 489, 504 (Pa. Super. 2017). However, "a challenge to asserted *in loco parentis* status in a particular context involves a fact-intensive inquiry, and may implicate mixed questions of law and fact." **In the Int. of K.N.L.**, 284 A.3d 121, 132 (Pa. 2022).

> In determining preliminary objections as to standing that turn on questions of fact, a trial court must hear testimony and admit other evidence into the record. **See C.G. v. J.H.**, [] 172 A.3d 43, 54 (Pa. Super. 2017)[.] We have explained that, when "a trial court holds such an evidentiary hearing, it must weigh the evidence and make credibility determinations to resolve any conflicts in the testimony." **Id.**

**Hunt v. Vardaro**, 317 A.3d 1046, 1050-51 (Pa. Super. 2024).

"The term *in loco parentis* literally means in the place of a parent." **Raymond v. Raymond**, 279 A.3d 620, 627 (Pa. Super. 2022) (citation and quotation marks omitted). It is well-established that "[*i*]n loco parentis is a legal status and proof of essential facts is required to support a conclusion that such a relationship exists." **T.B. v. L.R.M.**, 786 A.2d 913, 916 (Pa. 2001), citing **Kransky v. Glen Alden Coal Co.**, 47 A.2d 645, 646 (Pa. 1946). In **J.A.L. v. E.P.H.**, 682 A.2d 1314 (Pa. Super. 1996), our Court explained the

principle behind granting *in loco parentis* status to third parties for custody

purposes:

> The *in loco parentis* basis for standing recognizes the need to guard the family from intrusions by third parties and to protect the rights of the natural parent must be tempered by the paramount need to protect the child's best interest. Thus, while it is presumed that a child's best interest is served by maintaining the family's privacy and autonomy, that presumption must give way **where the child has established strong psychological bonds with a person who, although not a biological parent, has lived with the child and provided care, nurture, and affection, assuming in the child's eye a stature like that of a parent.** Where such relationship is shown, our courts recognize that the child's best interest requires that the third party be granted standing so as to have the opportunity to litigate fully the issue of whether that relationship should be maintained even over a natural parent's objections.

*Id.* at 1319-20 (emphasis added). Moreover, in ***J.A.L.***, our Court

acknowledged that it has been "suggested that where a petitioner who is not

biologically related to the child[,] but has established a parent-like relationship

with the child[,] seeks not to supplant the natural parent, but only to maintain

his relationship with the child through reasonable visitation or partial custody,

his burden to establish standing is easier." ***Id.*** at 1320, citing

***Commonwealth ex rel. Patricia L.F. v. Malbert J.F.***, 420 A.2d 572, 574

(Pa. Super. 1980). Further expounding on the concept of *in loco parentis*

status, our Court stated:

> In today's society, where increased mobility, changes in social mores[,] and increased individual freedom have created a wide spectrum of arrangements filling the role of the traditional nuclear family, flexibility in the application of standing principles is required in order to adapt those principles to the interests of each particular child. We do not suggest abandonment of the rule that

- 14 -

**a petitioner for custody who is not biologically related to the child in question must prove that a parent-like relationship has been forged through the parties' conduct**. However, we hold that the fact that the petitioner lived with the child and the natural parent in a family setting, whether a traditional family or a nontraditional one, and **developed a relationship with the child as a result of the participation and acquiescence of the natural parent** must be an important factor in determining whether the petitioner has standing. Additionally, where only limited custody rights are sought, the limited nature of the intrusion into the biological family must be considered in deciding whether standing has been made out.

*J.A.L.*, 682 A.2d at 1320-21 (emphasis added). "Accordingly, courts must reinforce the express statutory limitations to standing in private custody actions, albeit not so rigidly or absolutely as to deny one acting *in loco parentis* an opportunity to be heard, and not without regard for traditional standing principles." *K.N.L.*, 284 A.3d at 139, citing *T.B. v. L.R.M.*, 786 A.2d at 919-20 ("A determination of standing simply implies that the party has a substantial interest in the subject matter of the litigation and that the interest is direct, immediate[,] and not a remote consequence.").

Notably, in *T.B. v. L.R.M.*, 786 A.2d 913, 917, our Supreme Court established that "[t]he third party . . . can[]not place himself *in loco parentis* in defiance of the parents' wishes and the parent/child relationship." *See K.N.L.*, 284 A.3d at 144 ("[t]he assumption of a parental role **must originate with a legal parent's assent**, whether through encouragement or acquiescence") (emphasis added). "Furthermore, . . . any purported 'defiance' of a parent's wishes—as it relates to a third party's *in loco parentis* status—

corresponds to the formation of the parent-child relationship with the third party, not its continuation." *Id.*

Instantly, the trial court found Mother credible when she testified that she did not hold E.K. out as Child's father and that E.K. never assumed the obligations incident to a parental relationship or discharged parental duties with respect to raising Child—the focus of an *in loco parentis* analysis. Although it is clear that E.K. was part of Child's life for almost four years, from the moment of her birth until Mother asked him to move out of her home, Mother's testimony supports the conclusion that they did not live as a "family unit" and that Mother and E.K. did not co-parent Child. Rather, Mother consistently and intentionally let E.K. know that she did not assent to E.K. "assuming parental status" as a father-like figure to Child. *See id.* at 145 ("What is significant [in determining whether third party assumed a parental status and discharged parental duties] is the third party's relationship to the child, and how that relationship was forged, i.e., through assented assumption of a position more significant to the child than a frequent caretaker.").

Mother classified E.K. as a "an ex-boyfriend who was living with me sometimes, supporting me and helping me during the course of our relationship[,] and maybe executing care that was commensurate with his relationship to me, his romantic relationship to me." N.T. Hearing, 3/27/24, at 114. *See also id.* at 153 (Mother testifying she thought of E.K. as "a romantic partner [and] never thought of him as [Child's] dad or consented to him being [Child's] dad."). Mother testified that E.K. only occasionally bought

groceries for Mother and Child, never made regular payments toward the mortgage on Mother's house, and only did "some small acts of household maintenance" while he was living with Mother. *Id.* at 158, 161. Mother specifically testified:

> I think [E.K.] has assumed activities or interactions or tasks, I don't know, obligations, whatever you want to call them, **incidental to my relationship with** [**Child], not his parental responsibilities.**
>
> In other words, [E.K.]—what [E.K.] did for and with [Child] over the course of the relationship from the time that she was born until [she was] roughly three-and-[a]-half when he left w[as] not up to the level of parental responsibilities in terms of care or nurture.
>
> He definitely provided affection. I would say, you know, he offered affection in that way. Maybe he nurtured her at times, but the level of care was not that of a parent.

*Id.* at 207 (emphasis added). *See also id.* at 213 (Mother testifying E.K. "helped around the house[,] was involved in the life of [Child] as [Mother's] partner, not a parent, and[,] . . . later on in [Child's] life[, he was involved in] story time").

While E.K. and Child admittedly shared a bond, Mother testified, and the evidence showed that that bond was more of a close friendship, rather than a parent-child bond. *See id.*, 4/22/24, at 33; *id.* at 73 (Mother testifying Child called E.K. her "best buddy"); *K.N.L.*, 284 A.3d at 136 (standing demonstrated where individual demonstrates "he or she has 'a substantial interest in the subject matter of the litigation that must be direct and immediate, rather than remote, **and which distinguishes his interest form**

**the common interest of other citizens**'") (emphasis added). ***Cf. A.J.B. v. A.G.B.***, 180 A.3d 1263 (Pa. Super. 2018) (ex-wife granted *in loco parentis* status in custody dispute with mother and father of child, where ex-wife: participated in pregnancy and preparations for child's birth; was married to mother at time of child's birth; intended to jointly raise child with mother; was named as parent on child's birth certificate; was involved in naming child; was involved financially and otherwise with child during and after marriage; held herself out as child's parent; court held ex-wife's relationship with child that was fostered by mother could not be erased); ***M.L.S. v. T.H.-S.***, 195 A.3d 265 (Pa. Super. 2018) (step-father, an active-duty member of the United States Navy stationed in North Carolina, stood *in loco parentis* to Child where he: frequently traveled to child's home state to spend time with him and child's mother, where he read child bedtime stories, assisted child with his homework, attended parent-child conferences with mother, assisted in addressing child's social issues at school, taught child basic male grooming, assisted child in playing musical instrument, went on social outings with child, and listed child as his dependent so he could receive medical and dental benefits as part of step-father's military benefits package).

Thus, based upon a comprehensive review of the record, and mindful of the appropriate standard and scope of review, we conclude that the trial court correctly determined E.K. did not stand *in loco parentis* to Child. The trial court's findings and credibility determinations are supported in the record. ***See K.N.L.***, 284 A.3d at 133 (appellate court compelled to perform

comprehensive review of record for assurance the findings and credibility determinations are competently supported) (citation omitted). ***See C.G. v. J.H.***, 193 A.3d 891 (Pa. 2018) (former same-sex, unmarried partner of biological mother lacked standing to seek custody of biological mother's child as child was conceived via assisted reproductive means using anonymous sperm donor, pursuant to contract only signed by biological mother, such that partner was not biological parent, did not intend to conceive and raise child, and had not adopted child; partner's pre-separation contributions "did not amount to the discharge of parental duties," even where partner contributed financially to household overall, and biological mother did not encourage partner to assume parental status).

Admittedly, few of these cases are clear-cut or simple to analyze given the ever-changing landscape of today's family model. Nonetheless, we must remain true to the well-established principle that a party "who is not biologically related to the child in question **must prove that a parent-like relationship has been forged through the parties' conduct**." ***J.A.L.***, 682 A.2d at 1321 (emphasis added). To do otherwise would carve a dangerous exception into the principle of standing and, more specifically, infiltrate "the protected domain of the family." ***Id.*** at 1319.

Order affirmed.[6]

_____

[6] We commend the trial judge, the Honorable Brian K. Marshall, who painstakingly analyzed this fact-intensive matter, which included presiding
*(Footnote Continued Next Page)*

Judgment Entered.

*[signature: Benjamin D. Kohler]*

Benjamin D. Kohler, Esq.
Prothonotary


Date: 02/12/2025

_____

over three days of hearings involving multiple witnesses.  Although he found Mother credible and, ultimately, concluded that E.K. did not stand *in loco parentis* to Child, Judge Marshall rendered a balanced decision that recognized Mother's "narrow-minded" views on parenting and child-rearing, her "short sighted family planning decisions," and the "hypocritical" manner in which she navigated this, admittedly, "complex arrangement" among the parties.  Trial Court Opinion, 4/24/24, at 5-6.  Nonetheless, Judge Marshall's ultimate ruling is in conformity with the state of the law, which is of paramount importance to us as an error-correcting court.