J-S28001-25

2025 PA Super 233

DANIELLE HALE : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
v. :
:
KYRA HALE :
:
v. :
:
BREANNA MILLER : No. 651 MDA 2025
:
Appellant :
:

Appeal from the Order Entered April 16, 2025
In the Court of Common Pleas of Luzerne County Civil Division at No(s):
2021-03126

KYRA HALE : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
v. :
:
DANIELLE HALE :
:
v. :
:
BREANNA MILLER : No. 729 MDA 2025
:
Appellant :
:

Appeal from the Order Entered April 16, 2025
In the Court of Common Pleas of Luzerne County Civil Division at No(s):
2021-02780

BEFORE:  BOWES, J., OLSON, J., and KING, J.

OPINION BY BOWES, J.:                    **FILED: OCTOBER 15, 2025**

Breanna Miller ("Appellant") appeals the April 16, 2025, order that

denied her petition to intervene in custody proceedings pertaining to L.M., a

female child born in 2011, and G.H., a male child born in 2018 (collectively,

"the Children"). We reverse and remand with instructions.

We glean the relevant factual and procedural history of this matter from

the certified record. Although both custody matters are listed above, the

instant appeal solely pertains to Appellant's request to intervene and seek

partial physical and shared legal custody of G.H. The trial court aptly

summarized the relevant contours of the beginning of this litigation as follows:

> This case has a long and complex history. The parties to this case
> are Kyra Hale [("Kyra")] and Danielle Hale [("Danielle")]. Kyra is
> the biological mother of the Children, and Danielle is the former
> spouse of Kyra and second parent to the Children. Upon
> separation of the parties in 2021, Kyra remained in Luzerne
> County, Pennsylvania, with L.M., and Danielle relocated to New
> Jersey with G.H. There has been a significant amount of litigation
> between the parties regarding the custody arrangement of the
> Children.

Trial Court Opinion, 5/30/25, at 1 (cleaned up). The court also cogently

recounted the relevant aspects of the custody litigation that predated the

instant controversy:

> The most recent [c]ustody [o]rders dated February 7, 2023[,] and
> June 4, 2024[,] provide that [Kyra and Danielle] share legal
> custody of [the Children], with Kyra having primary physical
> custody of L.M. and Danielle having primary physical custody of
> G.H. Kyra has partial physical custody of G.H. on alternating
> weekends, and Danielle has partial physical custody of L.M. on
> alternating weekends, with the parties' weekends each coinciding
> such that [the Children] are together each weekend, regardless of
> which parent's home they are at.

*Id*. at 2. We note that these custody awards are also generally reflective of the awards predating February 2023. **See** N.T., 2/27/25, at 83.[1]

Danielle began dating Appellant in August 2021, while she and G.H. still resided in New Jersey. *Id*. at 6. Between August 2021 and January 2022, Appellant began assisting Danielle in caring for G.H. by watching him on several occasions and assisting in his potty-training regimen. *Id*. at 83-84, 254. In February 2022, Appellant, Danielle, and G.H. collectively relocated to Chester County, Pennsylvania, and began living together as a family unit. *Id*. at 7-8, 86. The certified record indicates that while they cohabited for approximately three years, Appellant played a significant role in co-parenting G.H. and providing for his day-to-day care.

Danielle and Appellant ended their relationship in September 2024 after unsuccessfully attempting "co-parenting" counseling. *Id*. at 8, 136-37. Consequently, Appellant relocated to a different unit of the same apartment complex as G.H. and Danielle. *Id*. at 8. On November 29, 2024, Appellant sought permission to intervene in the custody proceedings pursuant to 23 Pa.C.S. § 5324. Specifically, Appellant alleged that she had standing with respect to G.H. upon the basis of *in loco parentis*. **See** Petition for Permission to Intervene, 11/29/24, at ¶¶ 4-8. She claimed that she performed parental

_____

[1] The notes of testimony in this case are combined and encompass the full testimony from both hearings on February 27 and March 20, 2025, respectively. To avoid unnecessary confusion, we will refer only to the first hearing date in our citations to the relevant transcript passages in this writing.

- 3 -

duties with parental consent from 2021 until the time her relationship with Danielle ended in September 2024. *Id*. at ¶ 5(a)-(e). In addition, she attached to the petition a motion to modify custody that expressed her intent to seek shared legal custody and partial physical custody of G.H. *Id*. at Exhibit B.

On December 10, 2024, Danielle sought a protection from abuse ("PFA") order in an attempt to restrict Appellant's contact with G.H. *See* N.T., 2/27/25, at 168. Ultimately, the trial court denied the PFA petition, which was described as a "retaliatory" filing that lacked merit. *Id*. Despite these events, Danielle continued to permit G.H. to visit Appellant, with the most recent interaction occurring in approximately February 2025. *Id*. at 168-69. Communications in the certified record also reveal that Danielle offered to enter into an "unofficial custody arrangement" that would have permitted Appellant to have contact with G.H. in exchange for a monthly stipend of between $1,000 and $2,000. *Id*. at 171-72. Appellant declined to enter into such an agreement. *Id*. at 170-71.

The trial court held hearings on February 27 and March 20, 2025, wherein the parties testified. Additionally, G.H.'s guardian *ad litem*, Jessica Pleskach, Esquire, also briefly attested to G.H.'s feelings regarding Appellant. On April 16, 2025, the trial court filed an order and opinion that denied Appellant's request to intervene. Of note, both Appellant's petition and the court's order listed both of the Children's custody docket numbers.

On May 13, 2025, Appellant timely filed a single notice of appeal listing both docket numbers.[2] Appellant did not contemporaneously file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). However, the trial court directed her to file a concise statement, and she timely complied.[3] The trial court submitted a responsive Rule 1925(a)(2)(ii) opinion, which reiterated the reasoning in its original order.

Appellant raises the following issues for our consideration:

1. Did the trial court commit an error of law and/or an abuse of discretion in determining and identifying [Appellant] as a caregiver and performed [sic] tasks as a caregiver and not assuming a parental role and performing parental duties?

2. Did the trial court commit an error of law and/or an abuse of discretion in determining that Kyra did not provide permission for [Appellant] to perform parental duties and that both Kyra and [Danielle] unequivocally objected to [Appellant] acting as a parent and performing parental duties?

---

[2] As such, this Court entered an order noting that Appellant's notice did not comply with *Commonwealth v. Walker*, 185 A.3d 969, 977 (Pa. 2018) (requiring appellants to file separate notices of appeal when a single order resolves issues arising on more than one lower court docket). We directed her to file amended notices of appeal pursuant to Pa.R.A.P. 902(b)(1) within ten days. *See Commonwealth v. Young*, 280 A.3d 1049, 1057 (Pa.Super. 2022) (holding defects pursuant to *Walker* are susceptible to correction under Rule 902(b)(1) unless "good cause" is shown otherwise). Appellant timely complied, and we thereafter consolidated these cases *sua sponte*. *See* Pa.R.A.P. 513.

[3] Since no party has alleged prejudice as a result of these events, we decline to find waiver. *See In re K.T.E.L.*, 983 A.2d 745, 747 n.1 (Pa.Super. 2009) (holding an appellant's failure to simultaneously filed a Rule 1925 statement in a Children's Fast Track case did not result in waiver where the appellant later filed a statement and there were no allegations of prejudice).

3.      Did the trial court commit an error of law and/or an abuse of discretion in determining that the relinquishment of parental rights by [Danielle] and Kyra was necessary for [Appellant] to establish *in loco parentis* status?

4.      Did the trial court commit an error of law and/or an abuse of discretion in determining that evidence of strong bond with the minor child after separation is necessary for a finding of *in loco parentis* status?

Appellant's brief at 9 (cleaned up).

These issues collectively pertain to *in loco parentis* standing in custody proceedings.  Our Supreme Court has delineated our standard and scope of our review in such cases thusly:

Issues of standing generally raise pure questions of law for which we employ a *de novo* review of a trial court's decision.  As well, a challenge to asserted *in loco parentis* status in a particular context typically involves a fact-intensive inquiry, and may implicate mixed questions of law and fact.  Where factual findings and credibility determinations are at issue, we will accept them insofar as they are supported by the record.  In matters arising under . . . appeals of child custody . . . decisions, our plenary scope of review is of the broadest type; that is, an appellate court is not bound by the trial court's inferences drawn from its findings of fact, and is compelled to perform a comprehensive review of the record for assurance the findings and credibility determinations are competently supported.

**Interest of K.N.L.**, 284 A.3d 121, 133 (Pa. 2022) (cleaned up).

At a basic level, "[s]tanding relates to the capacity of an individual to pursue a particular legal action, and requires the petitioning litigant be adversely affected, or aggrieved, in some way."  **K.N.L.**, 284 A.3d at 136.  Traditionally, this requirement is met "when an individual demonstrates [that she] has a substantial interest in the subject matter of the litigation" that is

"direct and immediate, rather than remote, and which distinguishes [her] interest from the common interest of other citizens." *Id*. (cleaned up). With respect to the instant case, Pennsylvania statute confers standing to seek custody upon individuals who stand *in loco parentis* to a child. *See A.C. v. E.K.*, 331 A.3d 939, 945-46 (Pa.Super. 2025); *see also* 23 Pa.C.S. § 5324(2).

The term "*in loco parentis*" literally means "in place of a parent." *A.C.*, 331 A.3d at 946 (cleaned up). Specifically, it "refers to a person who puts oneself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption." *K.N.L.*, 284 A.3d at 144. The High Court has further explained that "[t]he foundational elements of *in loco parentis* status, **upon which all other considerations may rise or fall**, include the assumption of a parental role, and the discharge of parental duties." *Id*. (citing *C.G. v. J.H.*, 193 A.3d 891, 907-08, 910 (Pa. 2018)) (emphasis added). The assumption of a parental role, however, must originate with a legal parent's assent, whether through encouragement or acquiescence. *Id*. The High Court has also held that "the relevant time frame to determine whether a party stands *in loco parentis* is when the party developed the relationship with the child with the acquiescence or encouragement of the natural parent." *Id*. at 145.

In order to acquire standing in this fashion, a litigant must prove that a parent-like relationship has been forged through the parties' conduct to establish *in loco parentis* standing and seek custody. *See A.C.*, 331 A.3d at

- 7 -

946. While this test is "stringent" to "prevent intrusion into fundamental parental rights" by "those who are merely strangers," our Supreme Court has cautioned it must not be interpreted "so rigidly or absolutely as to deny one acting *in loco parentis* an opportunity to be heard[.]" **K.N.L.**, 284 A.3d at 139. We also remain especially mindful that a third-party litigant, like Appellant, "who is not biologically related to the child but [who] has established a parent-like relationship with the child [and] seeks not to supplant the natural parent, but only to maintain [her] relationship with the child through reasonable visitation or partial custody," has an easier burden to meet." **J.A.L. v. E.P.H.**, 682 A.2d 1314, 1320 (Pa.Super. 1996).

With these legal principles in mind, we turn to the merits of Appellant's arguments. The crux of her claims is that the trial court erred in concluding that she did not stand *in loco parentis* to G.H. **See** Appellant's brief at 14 ("[T]he trial court ignored the detailed testimony and substantial evidence presented by [Appellant] with regard to her assumption of a parental role and discharge of parental duties and instead determined that [Appellant] was simply a caregiver."). Appellant maintains that the evidence of record "unequivocally demonstrates that she meets the threshold for a finding of *in loco parentis*." **Id**. at 15. We agree.

In its opinion, the trial court acknowledged that Appellant performed numerous "caregiver" tasks during the three years that she lived with G.H. and Danielle. **See** Trial Court Opinion, 5/30/25, at 11 ("The testimony

established that [Appellant] performed many caregiving tasks for the minor child[.] . . . Importantly, for nearly all this time, [Appellant] and Danielle lived together as romantic partners."). The court, however, concluded that Appellant could not establish *in loco parentis* status because neither Danielle nor Kyra gave their "consent" for her to take on the various responsibilities regarding G.H. *Id*. The trial court also opined that Appellant could not demonstrate entitlement to *in loco parentis* status since neither Danielle nor Kyra had "relinquished" their "parental rights" between 2021 and 2024. *Id*. at 12. Finally, the court determined that Appellant's request to intervene failed since she did not show that she had a close psychological bond with G.H. *Id*. at 13.

Respectfully, our review indicates the trial court's analysis is legally flawed. Contrary to the court's holding, the relationship between Danielle and Appellant bears all the traditional hallmarks of a caregiver relationship that yields *in loco parentis* status. As our Supreme Court has explained, "[o]ne of the most obvious demonstrations of an *in loco parentis* relationship is where the natural parent and third party lived together as a 'family unit' while co-parenting the child." *K.N.L.*, 284 A.3d at 145 (citing *T.B. v. L.R.M.*, 786 A.2d 913, 919 (Pa. 2001)). Indeed, this Court has plainly observed that "[w]hen the party asserting *in loco parentis* status lives with the child and a natural parent as a family unit, our courts have held that the party has standing." *D.G. v. D.B.*, 91 A.3d 706, 709 (Pa.Super. 2014) (citation omitted). Under

the facts of this case, it is clear that Appellant's relationship with G.H. during the course of the three years she was involved with Danielle fell squarely within this well-defined rubric.

In addition to living with and assisting Danielle with G.H.'s everyday care, the certified record reflects that her involvement was much more akin to a co-parent than merely a babysitter or occasional caregiver. Particularly, Appellant was included in decision-making concerning the selection of G.H.'s medical providers, as well as helping to schedule and take G.H. to his various medical, dental, and therapy appointments. *See* N.T., 2/27/25, at 91-92, 116-18, 124-27, 132-3, 267-68. Appellant was also entrusted with registering G.H. for school and sports activities. *Id*. at 94-95, 101, 142, 151-54. She had independent access to the school's parent portal and was listed as a "secondary parent" on some of G.H.'s educational paperwork. *Id*. at 94-95, 101, 142, 269. Appellant was included in communications regarding G.H.'s education and regularly attended parent-teacher conferences and G.H.'s school functions, including numerous occasions when she appeared as the sole parental representative from her household. *Id*. at 94-95, 104-06, 111-16, 139. Additionally, Appellant served as G.H.'s "homeroom mom" when he entered first grade and she volunteered weekly with his school's parent-teacher organization ("PTO"). *Id*. at 129-31, 270. Appellant further took on various financial obligations with respect to G.H., including paying for clothing, sports programs, and groceries. *Id*. at 151-54, 270-73.

The above-described testimonies of Danielle and Appellant collectively reveal that Appellant was closely involved in the day-to-day care of G.H. and also played an important role in choosing his medical providers and acting in a parental role concerning his education. *See* N.T., 2/27/25, at 91-92, 116-18, 124-27, 132-3, 267-68. Indeed, Danielle testified that she discussed parental decisions regarding G.H. equally with both Appellant and Kyra during the relevant period of time. *Id*. at 10 ("[M]ost of the decisions I would talk to Kyra about and [Appellant] about regardless of who was first or not."). While Danielle indicated she was largely responsible for "hands-on parenting," she also conceded that Appellant was "actively helping take care" of G.H., particularly with respect to "administrative" tasks involving his medical and educational needs. *Id*. at 18, 24. Tellingly, Kyra's testimony similarly indicated that Appellant largely overtook Kyra's parental role as to G.H. during the course of her long-term romantic relationship with Danielle. She explained, "[b]ecause all of this, I was left out for the last three years. I've been blatantly left out of my child's life[.]" *Id*. at 282.

In all, the certified record reveals that Appellant accepted many obligations that fall squarely within the realm of parental responsibility and stature. *See K.N.L.*, 284 A.3d at 145; *D.G.*, 91 A.3d at 709. As a threshold matter, these facts augur strongly in favor of awarding Appellant *in loco parentis* status. *See T.B.*, 786 A.2d at 709 (holding that a woman who lived

- 11 -

with her girlfriend and "shared day-to-day child rearing responsibilities" for three years prior to their break-up was entitled to *in loco parentis* status).

We recognize, however, that the trial court's denial of intervention was largely predicated upon its conclusion that Appellant lacked consent from either Danielle or Kyra to take on a parental role. **See** Trial Court Opinion, 5/30/25, at 11-12. Assuming, *arguendo*, that Appellant never received explicit permission from either of G.H.'s legal parents, the certified record indicates that both Danielle and Kyra permitted Appellant to take on a parental role through their acquiescence of her efforts on G.H.'s behalf. This tacit ratification is consistent with consent *to in loco parentis* status. **See M.J.S. v. B.B.**, 172 A.3d 651, 657 (Pa.Super. 2017).

Specifically, Danielle testified she made no attempt to prevent Appellant from undertaking the above-described parental responsibilities:

> [DANIELLE'S ATTORNEY]: Why did you – why did you let [Appellant] do the things that she says she has done with [G.H.]?
>
> [DANIELLE]: Some of the things it was more of, like, I didn't want the arguments in the house. Like, she would get very angry if I told her no, she couldn't do something. Some of it, it just wasn't worth the fight. Like, she would like oh, I sent an e-mail to the teacher about this; and, while I didn't give her permission to send it, it wasn't always worth the argument . . . .
>
> **It wasn't worth it to me to sit here and fight with her about it.**

**See** N.T., 2/27/25, at 251 (emphasis added).

Kyra similarly testified that she permitted Appellant to take on a parental role without objection based upon her conclusion that Appellant was an

- 12 -

"irrelevant" individual in her eyes. *Id*. at 285 ("I put up with what she did, because I had no control over it because she was in the household."). Kyra further confirmed that she never reached out to Appellant to object because she chose to communicate solely with Danielle. *Id*. at 286. Indeed, Kyra explained that she relied upon Danielle to manage the relationship between Appellant and G.H. *Id*. at 283-86. As detailed above, Danielle permitted Appellant to take on a parental role.

Overall, we find this case to be analogous to **M.J.S.** There, this Court concluded that a biological parent who "did not attempt to intercede" in another party's "assumption of parental duties" had "acquiesced" to the development of an *in loco parentis* relationship through "implicit approval" by "failing to act." **M.J.S.**, 172 A.3d at 657. More particularly, we held that a legal parent who permitted a grandparent to perform "at least a shared role of carrying out the day-to-day care" for a child "acted in a manner consistent" with having given consent to the establishment of an *in loco parentis* relationship. **Id**.; **see also Tarr v. Young**, 287 A.3d 882, 2022 WL 12213672 at *6 (Pa.Super. 2022) (non-precedential decision) (holding that a natural parent's failure to act while a non-related, third-party petitioner performed parental duties resulted in the creation of *in loco parentis* standing).

The above-quoted testimony from Danielle and Kyra leaves no question that they similarly acquiesced to Appellant's assumption of a parental role through passive acceptance for several years. Even absent express consent,

G.H.'s legal parents freely allowed Appellant to closely share parental responsibilities and take on an analogous stature. Thus, we hold the trial court legally erred in concluding otherwise.[4]

Similarly, we reject the trial court's suggestion that Kyra and Danielle were required to fully "relinquish" their parental rights to G.H. in order for Appellant to acquire *in loco parentis* status. **See** Trial Court Opinion, 5/30/25, at 12. In **M.J.S.**, this Court refuted the notion that a party seeking to establish *in loco parentis* standing was required to assume the role of a "sole parental figure" in order to attain such status. **See M.J.S.**, 172 A.3d at 656-7. Our caselaw provides that **sharing** in the day-to-day responsibilities of raising a child in the role of a co-parent is sufficient to establish *in loco parentis* standing. **Id**. (citing **T.B.**, 786 A.2d at 709). As detailed above, there is no dispute Appellant undertook numerous shared parental obligations on G.H.'s behalf over a three-year period, which included independent input regarding

_____

[4] The trial court's denial of Appellant's intervention request on consent grounds was principally predicated upon the non-precedential holding **Thompson v. Davis**, 258 A.3d 533, 2021 WL 2472885 (Pa.Super. 2021) (non-precedential decision). **See** Trial Court Opinion, 5/30/25, at 11-12. In **Thompson**, this Court concluded that a third-party petitioner failed to establish *in loco parentis* status due to the lack of "express consent" from one of the natural parents. **Davis**, 2021 WL 2472885 at *9. Critically, however, this holding simultaneously acknowledged that **M.J.S.** presented a contrary interpretation of Pennsylvania law. **Id**. at *9 (citing **M.J.S.**, 172 A.3d at 657). For reasons that are unclear, the panel in **Thompson** declined to apply **M.J.S.** Based upon the analysis above, however, the instant case parallels the precedential holding of **M.J.S.** Under the specific facts of this case, we find **Thompson** to be unpersuasive.

his medical providers, education, and general welfare. *See* N.T., 2/27/25, at 91-95, 101, 111-18, 124-27, 132-3, 139, 142, 151-54, 267-73.

Finally, we address the aspect of the trial court's reasoning that concluded Appellant was required to show she had a close psychological bond with G.H. in order to establish *in loco parentis* standing. *See* Trial Court Opinion, 5/30/25, at 13 ("[T]he [c]ourt has no testimony or evidence to suggest that G.H. had a strong psychological bond with Appellant, that G.H. viewed Appellant as a parent, or that he continues to have a strong bond and view Appellant as a parent."). Once more, a review of our governing precedent indicates that the trial court misapplied the law.

We acknowledge, of course, that both this Court and our Supreme Court have previously noted that *in loco parentis* status should generally be awarded "where the child has established strong psychological bonds with a person who, although not a biological parent, has lived with the child and provided care, nurture, and affection, assuming in the child's eye a stature like that of a parent." *J.A.L*, 682 A.2d at 1320; *see also T.B.*, 782 A.2d at 917 (citing *J.A.L.*, 682 A.3d at 1319-20). The trial court explicitly relied upon this language in rendering its holding. *See* Trial Court Opinion, 5/30/25, at 5, 11. Respectfully, though, we believe that the trial court failed to view these cases in the proper legal context.

Our Supreme Court has subsequently clarified that affirmative proof of a strong psychological bond between a child and a third-party petitioner is **not**

- 15 -

a required element to establish *in loco parentis* standing to seek custody. **See**

**C.G.**, 193 A.3d at 909-10 (concluding that the arguable bond between a third-

party petitioner and a child is not a "decisive factor" concerning *in loco parentis*

standing); **see also K.N.L.**, 284 A.3d at 145-46 (indicating that the extent of

a bond between a third party and a child is a "secondary" consideration in

standing inquiries). Indeed, our High Court has reasoned that requiring a

strict bonding analysis in this context would be a "loose application" of

Pennsylvania law that would "undermine well-established principles of *in loco*

*parentis* analyses." **C.G.**, 193 A.3d at 909-10. Specifically, our Supreme

Court has explained that

> the import of the **J.A.L.** decision is **not** to introduce an
> examination of bonding into a standing inquiry, but rather to
> recognize a bond exists with a nonbiological caregiver just as with
> the natural parent where the caregiving role is assumed during a
> child's . . . early childhood; that is, where one has lived with the
> child and provided care, nurture, and affection, assuming in the
> child's eye a stature like that of a parent . . . , the primacy of the
> resulting bond warrants a *prima facie* right to *in loco parentis*
> status to be heard regarding the substance of the child's best
> interests.

**K.N.L.**, 284 A.3d at 146 (emphasis added). While it is "a concern to the courts

whether a child has developed strong psychological bonds" with a petitioning

party, such an inquiry with respect to standing is only relevant "insofar as it

sheds light on whether the person seeking standing was ever viewed as a

parental figure." **Id**. (citation omitted).

Based upon the foregoing, we cannot countenance the trial court's

reasoning on this particular point. By requiring strict and literal proof of a

close psychological bond between G.H. and Appellant, the trial court misapplied *J.A.L.* and failed to recognize the limiting interpretations issued by our Supreme Court in *C.G.* and *K.N.L.* As discussed at length above, Appellant assumed a "caregiving" role toward G.H. while she lived with him between the ages of three and six years old, which our caselaw has reasoned elevates Appellant, in the child's eyes, to "a stature like that of a parent." *K.N.L.*, 284 A.3d at 133; *see also J.A.L.*, 682 A.2d at 1321-22 (holding petitioner established the existence of a psychological bond for standing purposes by proving she had "the opportunity for bonding" with a child by providing care of a parental nature during a significant portion of their early childhood).

In sum, we conclude that the trial court erred in denying Appellant's request to intervene. By cohabiting and assuming parental responsibilities for three years of G.H.'s early childhood, Appellant satisfied the basic parameters of *in loco parentis*. *See T.B.*, 786 A.2d at 709. Furthermore, we hold that the inaction of Danielle and Kyra resulted in their acquiescence to Appellant's assumption of a parental role. *See M.J.S.*, 172 A.3d at 656-57. Finally, the trial court erred in requiring strict and literal proof of a strong psychological bond between G.H. and Appellant as a prerequisite to *in loco parentis* standing. *See K.N.L.*, 284 A.3d at 146; *C.G.*, 193 A.3d at 910. Furthermore, the length and quality of Appellant's involvement in co-parenting G.H. sufficiently established the opportunity for Appellant to assume a stature like

that of a parent from G.H.'s perspective. *See K.N.L.*, 284 A.3d at 133; *J.A.L.*, 682 A.2d at 1319-22.

Accordingly, we hereby reverse the order denying Appellant's request to intervene and remand for further proceedings consistent with this holding.[5]

Order reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

![signature of Benjamin D. Kohler]

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/15/2025

---

[5] We also emphasize that "[a] determination of standing simply implies that the party has a substantial interest in the subject matter of the litigation and that the interest is direct, immediate and not a remote consequence." *T.B. v. L.R.M.*, 786 A.2d 913, 920 (Pa. 2001). Accordingly, our holding in this case "does not speak to [Appellant's] chance of success on the merits, but merely affords her the opportunity to fully litigate the issue." *Id*.